**AM/FM INTERNATIONAL,**
**Petitioner–Appellant,**

v.

**Mary E. HUDDLESTON, Property Tax Administrator, Respondent–Appellee,**

**and**

**Board of Assessment Appeals, Appellee.**

**No. 94CA0964.**

Colorado Court of Appeals,
Div. I.

Aug. 24, 1995.

As Modified on Denial of Rehearing
Nov. 16, 1995.

Certiorari Granted Aug. 5, 1996.

restraining order.

Davis, Graham & Stubbs, L.L.C., Randall Weeks, Laurence E. Nemirow, Denver, for petitioner-appellant.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Mark W. Gerganoff, Assistant Attorney General, Denver, for respondent-appellee and appellee.

Opinion by Judge TAUBMAN.

In this property tax case, the Property Tax Administrator (PTA) denied the application of petitioner, AM/FM International (AM/FM), for exemption from *ad valorem* taxation of the land and building which comprises its national headquarters in Aurora. AM/FM's application was based upon its claim

that it owned and used the property solely and exclusively for strictly charitable purposes. AM/FM sought review by the Board of Assessment Appeals (Board), which upheld the PTA's denial of AM/FM's application. AM/FM appeals, and we reverse.

.The following facts relevant to this appeal were established by stipulation of the parties in lieu of a hearing before the Board. AM/FM was incorporated in Colorado as a non-profit corporation in 1982. Its articles of incorporation state that it is organized "exclusively for charitable and educational purposes...." Further, in its bylaws, AM/FM's purposes are characterized as follows:

Section 1. To foster the exchange of information, educational opportunities and research and development which will advance and promote the benefit of geographic and facilities management information systems.

Section 2. Further, to provide the benefits referred to above to utilities, local, state, and federal government and their agencies, other interested organizations and the general public.

AM/FM's membership consists of both individuals and organizations that have an interest in computer mapping information management and related technologies. Computer mapping information management, in general terms, is a process to use computers to model and display infrastructural, cultural, social, physical, and economic information for solving complex planning and management problems for providers of water, electricity, natural gas, and telecommunications.

In 1993, AM/FM had 1,697 individual members and 249 corporate members. It has five classes of membership: individual, sponsor, contributor, user affiliate, and student. The dues and benefits derived therefrom vary among each class.

AM/FM effects its purpose through a variety of educational and technical programs and publications, using the property for which it seeks exemption for all of its administrative functions as well as the coordination of all of its activities. AM/FM's key event is an annual conference which it coordinates and presents to enable its membership to attend technical presentations, to gain exposure to exhibitors displaying and demonstrating their products and services, and to receive a highly technical 1,000 page set of conference materials. The technical journal is the only one of its type available in the field of computer mapping information management.

AM/FM also publishes a newsletter to keep its membership informed of new developments in this field. Additionally, it publishes the best of numerous technical series papers focusing specifically on the particular disciplines of its user members. Further, AM/FM plans and conducts other forums and donates copies of its materials to libraries and educational institutions.

AM/FM's conferences, forums, and symposia are open to all members of the general public and, on the average, 65% of its attendees are not members of AM/FM. It also makes its publications available to the general public at roughly its cost of production and administrative staff time, with slight discounts for its members.

Additionally, apart from AM/FM's small, salaried administrative staff, the conferences, forums, and other activities of AM/FM are coordinated and conducted by volunteers. AM/FM valued its 1993 volunteer services at $766,250 and the PTA did not dispute this figure. This estimate included the time expended to coordinate and conduct the conferences, forums, and symposia, and the preparation and presentation of technical papers.

In the stipulation, the PTA also agreed that, excluding the student class, members of three of the remaining four classes received benefits with a market value that exceeded the cost of their membership dues. When multiplied by the number of members in those respective classes, the total annual benefit exceeded their dues by more than $200,000. In the remaining class, the estimated fair market value of the membership was only marginally less than the actual cost of the membership. In addition, AM/FM maintains annual scholarship and internship programs which, in 1993, totalled $27,000 in actual grants.

AM/FM derives most of its revenue from conference and exhibit fees and membership dues. It receives no revenue from advertisements in its publications. No dividends or distributions of income are made to members. Further, while AM/FM has managed to accumulate a financial surplus, it is undisputed that its dues and fees are calculated to cover only operating costs and services and that AM/FM is not engaged in any activity to derive a profit.

In its appeal to the Board, AM/FM argued that it is a charitable organization entitled to an exemption from *ad valorem* taxation because its activities are educational and because they lessened the burdens of government. While the Board recognized that AM/FM is properly classified as a non-profit corporation, it concluded that AM/FM had not established its entitlement to a property tax exemption because its activities were not of the type that lessened the burdens of government. The Board did not address AM/FM's contention that it qualified as an educational charity.

AM/FM presents its same arguments on appeal, and we conclude that it qualifies for exemption as an educational organization. Therefore, we need not determine whether its activities lessen the burdens of government.

The basis for the property tax exemption AM/FM seeks is Colo. Const. art. X, § 5, which provides:

Property, real and personal, that is used solely and exclusively for religious worship, for schools or for strictly charitable purposes ... shall be exempt from taxation, unless otherwise provided by general law.

Section 39–3–101(1)(g)(I), C.R.S. (1994 Repl. Vol. 16B) also provides for the charitable tax exemption as follows:

Property, real and personal, that is owned and used solely and exclusively for strictly charitable purposes and not for private gain or corporate profit if:

(A) such property is non-residential. . . .

■ The power to construe the constitutional words "charitable purposes" rests within the courts of this state. *United Presbyterian Ass'n v. Board of County Commissioners,* 167 Colo. 485, 448 P.2d 967 (1968). *See also* § 39–3–101(1)(g)(III), C.R.S. (1994 Repl.Vol. 16B) which provides: "It is recognized that only the judiciary can make a final decision as to whether or not a given property is or is not used for charitable purposes within the meaning of the state constitution. . . ."

■ The burden is on the taxpayer to establish the right to an exemption. See *Broadmoor Hotel v. Department of Revenue,* 773 P.2d 627 (Colo.App.1989). While tax exemption statutes are strictly construed against exemption, each case must be resolved on the basis of its own facts. *American Water Works Ass'n v. Board of Assessment Appeals,* 38 Colo.App. 341, 563 P.2d 359 (1976). Moreover, we must strictly construe taxing powers against the taxing authority and in favor of the taxpayer. *Tenney v. Board of Assessment Appeals,* 856 P.2d 89 (Colo.App.1993).

The definition of a "charity" most frequently quoted by the supreme court is from *Jackson v. Phillips,* 96 Mass. (14 Allen) 539, 556 (1867):

A charity, in the legal sense, may be more fully defined as a *gift,* to be applied consistently with existing laws, *for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education* or religion ... or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. (emphasis added)

*See also Electric Power Research Institute, Inc. v. City & County of Denver,* 737 P.2d 822 (Colo.1987); *American Water Works Ass'n v. Board of Assessment Appeals, supra.*

■ An organization's activities must be in accord with its beneficent purposes to qualify as a charitable organization. *Electric Power Research Institute, Inc. v. City & County of Denver, supra.* But, the fact that an organization charges dues or fees is not fatal to a claim for exemption. *West Brandt Foundation, Inc. v. Carper,* 652 P.2d 564 (Colo.1982).

■ Further, although relevant, the fact that an entity has obtained an exemption for purposes of income taxation pursuant to Internal Revenue Code § 501(c)(3) and is exempt from various state taxes is not dispositive of its claim for exemption from *ad valorem* taxation. *American Water Works Ass'n v. Board of Assessment Appeals, supra.*

■ Applying these principles here, we conclude that the undisputed evidence establishes, as a matter of law, that AM/FM is entitled to a charitable exemption for its property.

■ First, we conclude that AM/FM has made a gift. The concept of "gift" in the context of an application for tax exemption requires analysis of both the beneficent objectives, goals, or purposes of the entity and its actual conduct.

In determining whether a gift is involved, the Colorado Department of Local Affairs, Division of Property Taxation, of which both the PTA and the Board of Assessment Appeals are a part, has promulgated regulations listing factors to be considered including whether the members of the organization contribute a significant amount of volunteer time, the organization's status with the Internal Revenue Service, and the intent of the donors. Department of Local Affairs 8 Code Colo.Reg. § 1304–2(IV)(B).

Here, it is undisputed that the members of AM/FM contribute a significant amount of volunteer time, valued at $766,250. Further, a gift is realized by AM/FM's members and non-members in the form of materials received well in excess of the value of the fees charged for them. Finally, AM/FM has bestowed gifts on the general public in the form of scholarships and internships as well as donated materials to libraries and educational institutions. *See also* Department of Local Affairs 8 Code Colo.Reg. § 1304–2(IV)(B)(7) (where provision of materials and services to an organization's members is not based upon material reciprocity, the organization may be charitable).

The second element of the *Jackson* definition is also met here in that the gifts resulting from AM/FM's activities are realized by an indefinite number of persons. This is apparent from the fact that on average, 65% of the participants at its conferences and forums are non-members. Finally, and most importantly, AM/FM's activities significantly reduce its user members' costs of providing their services to the general public, and thus, enable them to provide new and more efficient services.

The final element needed to establish a charitable exemption is a showing that AM/FM's activities must "bring the minds of an indefinite number of persons under the influence of education."

Neither Colorado case law nor statute has interpreted "education" in the context of a charity. Therefore, it is instructive to look to federal taxation law to aid us in determining whether AM/FM's activities are within the scope of "education" for which tax exempt status applies.

Internal Revenue Code § 501(c)(3) provides an exemption from income taxation for: "corporations ... organized and operated exclusively for religious, charitable, scientific, testing for public safety, literacy, or *educational* purposes...." so long as no part of the corporation's net earnings inure to the benefit of any individual. The Internal Revenue Service has interpreted the term "educational," as used in § 501(c)(3), as "instruction or training of an individual for the purpose of improving or developing his [or her] capabilities," or "the instruction of the public on subjects useful to the individual and beneficial to the community." Treas. Reg. § 1.501(c)(3)–1(d)(3)(i).

Also, the Internal Revenue Service has held that an organization which conducted educational programs for bank employees and was organized to instruct or train individuals to improve their business or professional capabilities qualified for an exemption under Internal Revenue Code § 501(c)(3). Rev.Rul. 68–504, 1968–2 C.B. 211. Similarly, an organization that reports the results of research in a particular discipline through papers presented at meetings and disseminated through publications qualified as an educational and scientific organization ex-

empt under § 501(c)(3). Rev.Rul. 71–506, 1971–2 C.B. 233.

Here, the record is replete with evidence that the primary purpose of AM/FM is to educate individuals about the discipline of computer mapping information management. Thus, we conclude that it meets the purposes of education under the definition of charity.

Accordingly, the judgment is reversed, and the cause is remanded to the Board with directions to grant AM/FM's application for property tax exemption.

METZGER and PLANK, JJ., concur.