BOARD OF ASSESSMENT APPEALS, an agency of the State of Colorado; Mary E. Huddleston, Property Tax Administrator, Division of Property Taxation, an agency of the State of Colorado, Petitioners,

v.

AM/FM INTERNATIONAL, Respondent.

No. 95SC780.

Supreme Court of Colorado,
En. Banc.

June 2, 1997.

As Modified on Denial of Rehearing
July 28, 1997.

torney General, State Services Section, Denver, for Petitioners.

Davis, Graham & Stubbs, Laurence Nemirow, Randall Weeks, Denver, for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

This case arises out of an application for an exemption from property taxation filed by AM/FM International (AM/FM). The Property Tax Administrator (PTA) denied the application and AM/FM appealed to the Board of Assessment Appeals (BAA). The BAA upheld the PTA's denial. AM/FM filed an appeal with the court of appeals which reversed the BAA's decision in *AM/FM International v. Huddleston,* 920 P.2d 815 (Colo.App.1995). We granted certiorari to determine whether the court of appeals erred in holding that AM/FM was a "charity" as defined by Colorado law and thereby entitled to an exemption from *ad valorem* property taxes.[1] We hold that the BAA's decision was grounded in applicable law and supported by substantial evidence in the record. Therefore, we reverse the court of appeals and remand with instructions to reinstate the BAA's denial of AM/FM's application.

### I.

AM/FM and the PTA submitted stipulated facts in lieu of a hearing before the BAA. The BAA and the court of appeals relied upon these facts, as do we for purposes of our review. AM/FM is a Colorado non-profit corporation engaged in various activities related to "automated mapping." Automated mapping involves the use of computers to manage spatially distributed facilities and assets through a "geographic information system." The stipulated facts define a "geographic information system" as:

(i) a system of computer hardware, software and procedures designed to support

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Paul Farley, Deputy Attorney General, Larry A. Williams, First Assistant Attorney General, Mark W. Gerganoff, Assistant Attorney

---

**1.** The precise issue upon which we granted certiorari is as follows:

Whether the court of appeals, in the course of evaluating whether the respondent's property was entitled to an exemption from *ad valorem* taxation, erroneously determined that the respondent was a "charity" as that term has been construed by the Colorado Supreme Court and by the Department of Local Affairs, Division of Property Taxation, in 8 C.C.R. § 1304–2(IV) (02/95), and therefore improperly set aside the Board of Assessment Appeals' finding of ultimate fact?

the capture, management, manipulation, analysis, modeling and display of spatially referenced data for solving complex planning and management problems, and (ii) a spatial abstraction of the real world, including infrastructure, cultural, social, physical, economic, and other spatially related information, which abstraction is used to solve problems associated with the data whose common attributes are related to space and geography.

For example, computers are used to map infrastructure such as utility lines, or geographical attributes such as mineral or water deposits. The use of automated mapping for such purposes is referred to in this opinion as either computer mapping information management, or, simply, computer mapping.

AM/FM consists of five classes of members: individual, student, user affiliate, sponsor, and contributor. Individual members are representatives of utilities, governmental agencies, for-profit and non-profit corporations, academic institutions, and other organizations. Student members are full-time students engaged in studies of computer mapping information management or related fields. User affiliates are organizations such as natural gas and electric utilities, governmental agencies, telecommunications utilities, water and waste water utilities and agencies, transportation utilities, and other organizations that use computer mapping information management products or services but do not sell them for profit. Sponsor and contributor members are organizations that provide computer hardware and software products, consulting firms, service companies, and other firms engaged in the for-profit sale of computer mapping information management products or services. User affiliate, contributor, and sponsor members are collectively referred to as corporate members.

In 1993, AM/FM had 1,697 individual members and 249 corporate members.[2] Sixty percent of the individual members used computer mapping information management products and services for their own purposes;[3] the remaining forty percent of the individual members represented organizations engaged in the sale of computer mapping information management products and services.[4] Approximately ninety percent of the corporate members were for-profit corporations. The remaining ten percent were governmental public utilities.

Members of all five classes pay annual fees and receive various benefits in return. The annual fees range from fifty dollars for an individual member up to $3800 for sponsor members. According to the stipulated facts, the estimated value of services received annually by the individual, user affiliate, and sponsor members exceeds the amount of their annual fees.

AM/FM has been granted an exemption from federal income tax under section 501(c)(3) of the Internal Revenue Code (I.R.C.), and has been granted an exemption from sales and use tax by the Colorado Department of Revenue.[5] In addition, AM/FM

2. There were thirty-seven individual members in Colorado, including: American Water Works Association; Bureau of Land Management; City of Aurora; City of Fort Morgan; City of Fort Collins; Colorado Springs Department of Utilities; Denver Water Department; Douglas County; Front Range College; K N Energy; Kelly Cable Corporation; Public Service Company of Colorado; TST, Inc.; US West Communications; and the Upper Eagle Valley Sanitation District. The remaining individual members are based outside Colorado.

3. Of this sixty-percent, sixty-nine percent represented regulated public utilities or for-profit corporations; twenty-three percent represented governmental agencies; and eight percent represented academic institutions or were students.

4. Ninety percent of these individual members represented for-profit companies.

5. Section 39–26–114(1)(a), 16B C.R.S. (1994), provides in pertinent part:

(1)(a) There shall be exempt from taxation under the provisions of this part 1 the following:

...

(II) All sales made to charitable organizations, in the conduct of their regular charitable functions and activities....

For purposes of section 39–26–114, "charitable organization" means:

any entity organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes ... no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of

has received a Special Bulk Rate Authorization as a qualified nonprofit corporation from the United States Postal Service.

AM/FM's Articles of Incorporation provide that (1) no part of AM/FM's net earnings shall inure to the benefit of or be distributable to its members, trustees, or other private person except as reasonable compensation for services rendered and distributions for AM/FM's purposes; (2) AM/FM is prohibited from carrying on activities not permitted to be carried on by a corporation exempt from Federal Income Tax under section 501(c)(3) of the I.R.C. or by a corporation, contributions to which are deductible under section 170(c)(2) of the I.R.C.; and (3) in the event of dissolution, assets remaining after payment of liabilities are to be disposed of exclusively for charitable, educational, religious, or scientific purposes to an organization exempt under section 501(c)(3) of the I.R.C. According to the Articles of Incorporation, AM/FM is "organized exclusively for charitable and educational purposes." AM/FM's purposes, as stated in its bylaws, are (1) to foster the exchange of information, educational opportunities, and research and development which will advance and promote the benefits of geographic and facilities management information systems; and (2) to provide these benefits to utilities; local, state, and federal governments and their agencies; other interested organizations; and the general public.

AM/FM's principal activity in furtherance of these purposes is the hosting of an annual conference. Those who attend the conference listen to technical seminars, exchange ideas with other individuals and organizations, and purchase products and services [6] related to computer mapping information systems. Reprints of the technical papers presented at the conferences are donated to libraries and educational institutions. AM/FM estimates the annual value of these donations to be about $4350. Through the

organization of the conferences, AM/FM serves as a clearinghouse for information about computer mapping.

In addition to the annual conference, AM/FM engages in the following activities related to the development and use of computer mapping: (1) publishes a bi-monthly newsletter dedicated to computer mapping information management; (2) collects technical papers concerning the particular disciplines represented by its membership and publishes the best of these papers; (3) co-sponsors the technical GIS/LIS Conference and Exposition, reprints the proceedings, and donates them to user affiliate members, libraries, and educational institutions; (4) awards approximately $22,000 for scholarships and internships annually; and (5) conducts an annual forum for the senior management of its user affiliate members to educate them about computer mapping information management. In addition, AM/FM participated in the first National Geo–Data Policy Forum, a joint forum composed of representatives from the non-profit sector, the private sector, and federal governmental agencies concerning the development and use of the national spatial data infrastructure. AM/FM is also instrumental in facilitating the development of standards for computer mapping information management, although at the time the stipulated facts were submitted AM/FM had not developed any standards.

All of AM/FM's conferences and seminars are open to the members of the general public, and, on average, sixty-five percent of those in attendance are not members of AM/FM. Both members and non-members are required to pay registration fees for conferences and seminars, but the fees are higher for non-members. AM/FM also makes its publications available to the general public at roughly AM/FM's actual cost of production

statements), any political campaign on behalf of any candidate for public office.

§ 39–26–102(2.5), 16B C.R.S. (1994).

According to the stipulated facts, AM/FM does not engage in any propaganda or otherwise attempt to influence legislation or any political campaign on behalf of any candidate as a sub stantial part of its activities.

6. AM/FM designates areas at each conference where vendors display their products and services for eventual sale. AM/FM also designates a separate "User Exhibit" area where governmental agencies, non-profit organizations, and public utilities can set up displays.

and administrative staff time, with discounts for its members.

During AM/FM's 1991 and 1992 fiscal years, it incurred operating losses as a result of expanded services to user organizations and extensions of AM/FM's educational programs. As a result of these losses, AM/FM was required to reduce its reserves; notwithstanding this reduction, at the conclusion of 1992, AM/FM had an accumulated unrestricted fund balance of $464,706.

The conferences and other activities are conducted by AM/FM's administrative staff and unpaid volunteers. In 1993, these volunteers provided 15,325 hours of service. The stipulated facts quantify these services at fifty dollars per hour for a total value of $766,250.

The events that ultimately led to the filing of this action began in December 1989, when AM/FM filed an Application for Exemption of Property (the Application) requesting an exemption from general taxation of property (the Property) it owns and uses as its administrative headquarters.[7] AM/FM requested the exemption on the grounds that the Property was being used for non-residential charitable purposes. The PTA issued a tentative determination denying the exemption. The PTA held a public hearing to enable AM/FM to present evidence that the Property satisfied the requirements for exemption.[8] After the hearing, the PTA issued a final determination denying exemption on the grounds that the "Property is not used for strictly charitable use in that there is no gift as required within the rules for exemption."

AM/FM filed an appeal with the BAA arguing that AM/FM was entitled to an exemption because it lessened the burdens of government by helping public utilities "to increase their operating efficiencies and their ability to provide basic services, to reduce

their costs, and to enhance their ability to respond to emergency situations." AM/FM further contended that it was a "charitable clearinghouse of highly complex technical information and education for all who want to know about applying the computer age to mapping and the efficient management of information gleaned therefrom."

The BAA held that AM/FM had not clearly established its right to an exemption and denied the Application. In particular, the BAA concluded that the critical deficiency in AM/FM's case was the absence of any evidence that computer mapping information management was a responsibility of government such that it would have to be carried on by government at taxpayer expense but for AM/FM's activities.

AM/FM filed an appeal in the court of appeals arguing that it provided numerous educational and charitable benefits to the people of Colorado. The court of appeals concluded that AM/FM was entitled to an exemption as a charitable organization because (1) AM/FM's activities constituted a gift; (2) AM/FM's gift was for the benefit of an indefinite number of persons; and (3) AM/FM's activities brought the minds of those persons "under the influence of education." *AM/FM Int'l*, 920 P.2d at 819. The court of appeals concluded that because AM/FM qualified for an exemption as an educational organization, it was not necessary to determine whether AM/FM's activities lessened the burdens of government. *Id.* at 818.

### II.

The appropriate standard to be applied in reviewing the BAA's decision is set forth in section 24–4–106(7), 10A C.R.S. (1988).[9] On appeal, AM/FM argued that the

---

**7.** The Property consists of a building and the real property upon which it rests located at 14456 East Evans in Aurora, Colorado.

**8.** No transcript or minutes of the hearing are contained in the record. However, the record does contain a memorandum written by the Manager of Exemptions which indicates that the hearing was held on June 18, 1992.

**9.** This standard is incorporated through section 39–2–117(6), 16B C.R.S. (1994), which in turn refers to section 24–4–106(11), 10A C.R.S. (1988). Section 24–4–106(11) clarifies that the standard of review is set forth in section 24–4–106(7), which provides:

If the court finds no error, it shall affirm the agency action. If it finds that the agency action is arbitrary or capricious, a denial of statutory right, contrary to constitutional right,

BAA arbitrarily and erroneously concluded that AM/FM was not a charitable organization. The determination of whether AM/FM is a charitable organization for purposes of qualifying for a property tax exemption is one of ultimate fact, involving a mixed question of law and fact. *See Electric Power Research Inst., Inc. v. City & County of Denver,* 737 P.2d 822, 826 (Colo.1987) (*EPRI*). Pursuant to the standard of review contained in section 24–4–106(7), "[a]n ultimate finding of fact will be set aside by a reviewing court only if, assuming there is evidence to support the finding, it is 'contrary to law,' section 24–4–106(7), C.R.S.1973 (1982 Repl.Vol. 10); stated conversely, an ultimate finding of fact will be sustained if it has a reasonable basis in law." *Lee v. State Bd. of Dental Exam'rs,* 654 P.2d 839, 844 (Colo.1982).

The BAA denied the Application because it concluded that AM/FM basically operated on a *quid pro quo* basis and that AM/FM's use of the Property neither lessened the burdens of government nor inured to the benefit of the people of Colorado. Based upon our review of the stipulated facts and the applicable law, we find that there was a reasonable basis in law for the BAA's conclusions that AM/FM basically operated on a *quid pro quo* basis and that its use of the Property did not lessen the burdens of government within the meaning of the constitution. Therefore, the BAA properly denied the Application and the court of appeals erred in setting aside the decision.

### III.

■ Each claim for tax exemption must be determined upon the facts presented and in light of the applicable constitutional and statutory provisions. *See United Presbyterian Ass'n v. Board of County Comm'rs,* 167 Colo. 485, 502, 448 P.2d 967, 975 (1968). The Colorado Constitution contains the following provision concerning exemption from property taxation:

> Property, real and personal, that is used solely and exclusively for religious worship, for schools or for strictly charitable purposes ... shall be exempt from taxation, unless otherwise provided by general law.

Colo.Const. art. X, § 5. We are not dealing here with either the exemption for property owned and used for religious purposes or for a school. Rather, we are dealing with the issue of whether AM/FM uses the Property "for strictly charitable purposes" as that term is used in the constitution and in the statute on which AM/FM based the Application. That statute, section 39–3–108(1), 16B C.R.S. (1994), provides in pertinent part:

> Property, real and personal, which is owned and used solely and exclusively for strictly charitable purposes and not for private gain or corporate profit shall be exempt from the levy and collection of property tax if:
>
> (a) Such property is nonresidential....

Although both the constitution and the statute allow an exemption when property is used for "strictly charitable purposes," neither attempts to define the meaning of these words. Instead, it is left to the judiciary to construe their meaning on a case by case basis. *See West Brandt Found., Inc. v. Carper,* 652 P.2d 564, 567 (Colo.1982). "[O]nly the judiciary may make a final decision as to whether or not any given property is used for charitable purposes within the meaning of the Colorado constitution." § 39–3–101, 16B C.R.S. (1994). The appellate courts in this

---

power, privilege, or immunity, in excess of statutory jurisdiction, authority, purposes, or limitations, not in accord with the procedures or procedural limitations of this article or as otherwise required by law, an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law, then the court shall hold unlawful and set aside the agency action and shall restrain the enforcement of the order or rule under review, compel any agency action to be taken which has been unlawfully withheld or unduly delayed, remand the case for further proceedings, and afford such other relief as may be appropriate. In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party. In all cases under review, the court shall determine all questions of law and interpret the statutory and constitutional provisions involved and shall apply such interpretation to the facts duly found or established.

§ 24–4–106(7), 10A C.R.S. (1988).

state have struggled with the appropriate definition of a charity, and have consistently harkened back to the eloquent language of *Jackson v. Phillips,* 96 Mass. (14 Allen) 539, 556 (1867), which provides:

> A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with the existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.

See *EPRI,* 737 P.2d at 826; *West Brandt,* 652 P.2d at 567; *United Presbyterian Ass'n,* 167 Colo. at 494–95, 448 P.2d at 971–72.[10]

The *Jackson* definition requires a gift for the benefit of an indefinite number of persons. The uncertainty arising out of the definition is whether "otherwise lessening the burdens of government" is a modifier that applies to all of the previously mentioned kinds of gifts, or whether it is a separate and distinct avenue by which to establish a gift.

The court of appeals implicitly concluded that because the requirements of providing education and lessening the burdens of government are phrased in the disjunctive, an organization must satisfy one but not both. We disagree with this interpretation in the context of this case. Further, we hesitate to place too much emphasis on the exact wording used in *Jackson.* Rather, we must look primarily to the rationale underlying tax exemptions for charitable organizations.

Our prior decisions have recognized that an exemption for a charitable organization is predicated in part upon the fact that it provides a service to the public that counterbalances the loss of revenue from taxation. *See West Brandt,* 652 P.2d at 568 ("One justification for exempting charitable enterprises from taxation is that they perform functions which tax-supported governmental entities would otherwise be required to perform...."); *United Presbyterian Ass'n,* 167 Colo. at 501, 448 P.2d at 975; *Young Life Campaign v. Board of County Comm'rs,* 134 Colo. 15, 22, 300 P.2d 535, 539 (1956), *overruled on other grounds, General Conference of the Church of God—7th Day v. Carper,* 192 Colo. 178, 180, 557 P.2d 832, 833 (1976).[11] We explained this requirement in *Kemp v. Pillar of Fire,* 94 Colo. 41, 46, 27 P.2d 1036, 1038 (1933), as follows:

> If the plaintiff did not carry on this educational and charitable work, it would have to be carried on by the public at the expense of the taxpayers, and doubtless that expense would exceed the taxes that the plaintiff is relieved from paying. It is on similar grounds that tax-exemption statutes are upheld as constitutional.

■ The court of appeals determined that AM/FM was an educational charity, defining "educational" as either "instruction or training of an individual for the purpose of improving or developing his [or her] capabilities," or "the instruction of the public on subjects useful to the individual and beneficial to the community." *AM/FM Int'l,* 920 P.2d at 819. Such a definition would create a separate exemption for a charitable organization whose work served some educational purpose whether or not the instruction of-

---

**10.** We granted certiorari to determine whether the court of appeals erred in determining whether AM/FM was a "charity" as that term has been construed by this court and the Department of Local Affairs, Division of Property Taxation. The Division of Property Taxation's definition of "charitable organization" is consistent with the case law, and therefore, we do not address it separately.

**11.** We note that this same requirement does not apply to religious organizations. In *General Conference of the Church of God—7th Day v. Carper,* 192 Colo. 178, 180, 557 P.2d 832, 833 (1976), we held that the "social benefit" analysis in the

determination of exemptions was not applicable in the evaluation of property used for religious purposes. We distinguished between charitable and religious exemptions because "a religious group does not have as a fundamental purpose the providing of services which the state would otherwise have to provide since the state is constitutionally prohibited from such religious involvement." *General Conference,* 192 Colo. at 180–81, 557 P.2d at 834. We did not disturb the validity of the "social benefit" analysis in the determination of charitable exemptions. *Id.* at 180, 557 P.2d at 833.

fered related to a degree, certificate, or level of minimum competence; and whether or not the instruction benefitted society. We hesitate to adopt such an interpretation because of the breadth and pervasiveness of its implications. We further do not view it as supported by the controlling statutes. We conclude that the appropriate test is not whether AM/FM's operations were educational, but rather whether they benefitted the public by lessening the burdens of government.[12]

Thus, we must now determine whether the BAA's conclusions on that point were supported by the record and had a reasonable basis in law. *See Lee*, 654 P.2d at 844. In considering whether there is a lessening of the burdens of government we have commented as follows:

> [I]t is appropriate to determine whether the use of property is of a kind which relieves government of a task it would otherwise have to perform, and whether the benefit conferred by that use inures primarily to the people of Colorado upon whom the burden of any additional taxation resulting from exemptions will fall.

*West Brandt*, 652 P.2d at 568.

Based on our holding in *West Brandt*, the BAA held that AM/FM's use of the Property did not lessen the burdens of government because (1) computer mapping information management is not a responsibility of government such that it would have to be carried on by government at taxpayer expense

in the absence of AM/FM's activities; and (2) AM/FM's use of the Property did not inure primarily to the benefit of the people of Colorado who would bear the burden of additional taxation if exemption were granted.

■ In light of the stipulated facts, it is beyond dispute that AM/FM's use of the Property does confer some benefit on various governmental entities and public utilities.[13] It is AM/FM's burden, however, to demonstrate that this use relieves a governmental function and inures to the benefit of the public. *See Security Life & Accident Co. v. Heckers*, 177 Colo. 455, 458, 495 P.2d 225, 226 (1972) (holding that burden is on the taxpayer who claims an exemption to clearly establish the right to such exemption). *Ad valorem* property taxes are intended to raise revenue to defray the general expenses of the taxing entity. *See Zelinger v. City & County of Denver*, 724 P.2d 1356, 1358 (Colo. 1986). Property taxes are a critical source of funding through which government is able to provide essential services such as police and fire protection, public health care and hospitals, public utility facilities, and schools. Thus, property tax exemptions are reserved for circumstances where there is a distinct showing of public benefit.

■ AM/FM argues that it benefits the public by offering a service to governmental entities and public utilities, not by making a gift to individual citizens.[14] When the public

---

12. AM/FM argues that we did not require an educational organization to show that it lessened the burdens of government in *Denver Turnverein v. McGlone*, 91 Colo. 473, 15 P.2d 709 (1932). In that case, we concluded that a plaintiff, who was conducting an educational institution, was entitled to an exemption from property taxation. *Denver Turnverein*, 91 Colo. at 479, 15 P.2d at 711. Although we did not specifically find that the plaintiff's use of the property relieved the government of a burden, the facts of that case suggest that this requirement was satisfied.

13. The stipulated facts contain numerous examples of benefits received by public utilities and at least one governmental entity in Colorado as a result of their membership in AM/FM. In its brief before this court, AM/FM argues that these examples include the following:

> The Public Service Company of Colorado developed an enhanced natural gas leak survey system based upon information obtained at

AM/FM's conferences.... Aurora, Colorado recognizes annual cost savings of approximately $30,000 from Computer Mapping technology, utilizing the services, conferences, and materials of AM/FM.... The Denver Board of Water Commissioners experiences enhanced efficiencies in delivering water to the general public as a result of its participation in AM/FM's conferences.... US West Communications is better able to provide telecommunications services to the public as a result of AM/FM's activities.

14. In its briefs to this court, AM/FM summarizes the manner in which it provides a public benefit as follows:

> AM/FM benefits the general public by directly assisting providers of such essential services as water, gas, electricity, and telecommunications. The Stipulated Facts provide numerous specific examples of benefits made available by AM/FM to local governments and regulated

benefit is channeled through a governmental entity or public utility, we hold that the benefit must necessarily lessen the burdens of government.[15]

■ Nothing in the stipulated facts suggests that computer mapping itself is a primary responsibility of government, or that AM/FM directly performs any activities for which the government is responsible or which the government would be forced to assume in the absence of AM/FM's activities. Although AM/FM's activities may assist the government in performing its functions, this assistance is provided indirectly by enabling governmental entities and public utilities to perform computer mapping on their own and by providing a clearinghouse which puts government in contact with sellers of services and products related to computer mapping. Computer mapping is a form of technology which may improve the delivery of such services as water, electricity, gas, and telecommunications, and the development of emergency response systems for police officers, firefighters, and ambulances. Computer mapping may also have numerous other applications to governmental and non-governmental services. However, AM/FM's role, as described in the stipulated facts, is at best, secondary and not primary to a governmental function.

We find AM/FM's activities distinguishable from those of the Electric Power Research Institute (EPRI), a nonprofit electrical research corporation, which justified an exemption from the payment of sales tax pursuant to the Denver Revised Municipal Code. *See EPRI*, 737 P.2d at 826–28. In *EPRI*, we

noted that the facility constructed by EPRI was the site for research on methods of reducing air pollution and increasing efficiency in the production and transmission of electricity, which research could not have been duplicated by governmental entities without expenditure of large sums of taxpayer dollars. *Id.* at 828. In short, unlike AM/FM, EPRI was performing a function that the government would have been required to perform itself at significant expense without EPRI's contribution.[16]

There is a distinction between the circumstance in which an organization serves governmental agencies by augmenting their capacity or efficiency and the circumstance in which an organization in fact performs a governmental function that would otherwise have to be financed by public revenue. The benefit to the public occasioned by the private entity performing a public function should more than offset the loss of property tax revenues. However, the analysis must not be mired in precise dollar calculations, but rather must focus on the service being performed and the determination of whether that service is, indeed, one that confers a real benefit on the public. The analysis is necessarily fact intensive and case specific.

Here, the BAA recognized the distinction between performing a governmental function and providing a service to the government; and, after considering AM/FM's purpose, membership, activities, and use of the Property, concluded that there was no evidence that computer mapping was a responsibility of government that would have to be carried

utilities that provide such services. Ultimately, such benefits help members of the public who subscribe to those services.

**15.** Although there is some evidence that members of the general public do attend the annual conference for a fee and do have access to the donated library materials, the stipulated facts overwhelmingly demonstrate that the principle manner in which AM/FM provides a public benefit is through the provision of services to governmental entities and public utilities.

**16.** In *American Water Works Ass'n v. Board of Assessment Appeals*, 38 Colo.App. 341, 563 P.2d 359 (1976) (*AWWA*), the court of appeals concluded that the American Water Works Association (AWWA) was entitled to exemption from *ad*

*valorem* taxation of the land and building comprising its national headquarters in Denver. *AWWA*, 38 Colo.App. at 344–46, 563 P.2d at 362–63. AWWA was a nonprofit corporation formed to advance knowledge and exchange information pertaining to the management of water works and water supply. The court of appeals focused primarily on whether AWWA was entitled to an exemption even though it charged fees for membership, publications, and seminars, and for advertising in its publications. The question we address today was not squarely presented in AWWA; however, to the extent the opinion would suggest a different governmental function analysis than that which we here adopt, we disapprove it.

on at public expense if not for AM/FM. We are satisfied that this conclusion is supported by a reasonable basis in law and by substantial evidence in the record.[17]

■ We emphasize the narrow application of our holding to the facts of this case. The determination as to whether property is used for "strictly charitable purposes" must be made on a case-by-case basis to determine whether such use satisfies the statutory and constitutional requirements. In concluding that the BAA's determination has a reasonable basis in law and is supported by evidence in the record, we are reaffirming the basic principle that property tax exemptions are reserved for organizations providing a public benefit. AM/FM argues that it benefits the public by offering a service to governmental entities and public utilities. When the public benefit is channeled through a governmental entity or public utility, the benefit must necessarily lessen the burdens of government. The BAA concluded that computer mapping is not a responsibility of government and that, therefore, AM/FM's activities do not lessen the burdens of government. Without a direct offset or lessening of the burdens of the public entities enjoying AM/FM's services, AM/FM's application for exemption must fail.

### IV.

We turn now to the question of whether AM/FM provides a "gift," an issue which the parties address extensively in their briefs. The BAA did not expressly consider this issue in its decision. However, the BAA did conclude that AM/FM basically operates on a *quid pro quo* basis.

AM/FM uses the Property to print various publications and technical papers related to computer mapping, and to organize conferences and seminars for the exchange of information on this discipline. These activities are subsidized to a large extent by time volunteered by AM/FM's committee members and the speakers at their conferences. Presumably, if these individuals did not volunteer their time, the cost of the conferences, seminars, and publications would increase. AM/FM also makes donations toward the promotion of computer mapping in the form of scholarships and reprints of technical papers.

■ Notwithstanding the benefits provided through volunteer time, donations, and scholarships, we conclude that the BAA's determination that AM/FM basically operates on a *quid pro quo* basis is reasonable in light of the facts and applicable law. All of AM/FM's members pay annual membership fees. Although most classes of members receive benefits that exceed the amount of the fees they pay, this does not necessarily establish a gift for exemption purposes. Payment of fees "does not foreclose charitable exemption, even if the facility involved does not operate at a loss, as long as any surplus is devoted to charitable purposes." *West Brandt*, 652 P.2d at 568. At the end of 1992, AM/FM had an unrestricted fund balance of $464,706. Although this surplus could not be paid to members as dividends, and upon dissolution would be distributed to an organization exempt from taxation pursuant to section 501(c)(3) of the I.R.C., the surplus could have been used for other than charitable purposes. For example, this money could have been used to pay salaries. The fact that AM/FM charges fees that result in a large surplus which could be paid out as salaries, although not dispositive, weighs against a finding that AM/FM provides a gift.

Only those members and non-members who can afford the applicable fees are entitled to attend the conferences and seminars. With the exception of discounts for student members, AM/FM does not lower its confer-

---

**17.** Having concluded that the BAA's determination that AM/FM did not lessen the burden of government is supported by the record and has a reasonable basis in law, we need not determine whether any benefit resulting from AM/FM's activities inured primarily to the people of Colorado, versus having benefit to citizens of other states. Such an inquiry may be foreclosed in any event. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, —— U.S. ——, —— – ——, 117 S.Ct. 1590, 1595–1601, 137 L.Ed.2d 852 (1997) (holding that an otherwise generally applicable state property tax violates the Commerce Clause if its exemption for property owned by charitable institutions excludes organizations operated principally for the benefit of nonresidents).

ence registration fees to accommodate an inability to pay. To the extent that the conference fees are lower than they would otherwise be as a result of the volunteer time, AM/FM provides a gift to those who attend the conferences. However, it is difficult to calculate the full amount of this gift. There is no indication in the record that the value of the conference, even when the value of the volunteer services is factored in, exceeds the cost of attendance in an amount sufficient to conclude that the organization of the conference is a charitable gift.

 Reprints of conference and seminar proceedings, technical papers, and AM/FM's monthly publication are available for purchase at approximately AM/FM's actual cost of physical production and administrative staff time, not including the cost of the effort of contributing volunteers. The fact that AM/FM sells these items essentially at cost does not make them charitable gifts. "[W]here material reciprocity between alleged recipients and their alleged donor exists—then charity does not." *United Presbyterian,* 167 Colo. at 503, 448 P.2d at 976.

AM/FM donates reprints of the proceedings of the Annual Conference and the GIS/LIS Annual Conference to libraries and educational institutions, and also donates proceedings of the GIS/LIS Annual Conference to its user affiliate members. The stipulated facts value these donations at $10,850. In addition, in 1993 AM/FM provided $27,000 for scholarships and internships. These donations do not represent an insubstantial amount. However, many corporations provide scholarships and monetary donations, and although the donations themselves may be tax deductible, the fact that a corporation makes such donations does not entitle it to a property tax exemption. Instead, the overall conduct of the corporation must be considered. In this case, after considering the record as a whole, we are satisfied that the BAA's conclusion that AM/FM basically operates on a *quid pro quo* basis was supported

by substantial evidence and had a reasonable basis in law.[16]

### V.

We hold that the BAA's decision that AM/FM did not clearly establish its right to an exemption is supported by a reasonable basis in law. Although AM/FM's activities are useful to various public utilities and governmental entities, AM/FM did not clearly establish that its use of the Property lessened the burdens of government within the meaning of the constitution. There is also a reasonable basis in law for the BAA's conclusion that AM/FM basically operates on a *quid pro quo* basis. Therefore, we reverse the court of appeals and remand with instructions to the court of appeals to reinstate the BAA's decision denying the Application.

---

**16.** The Division of Property Taxation, Department of Local Affairs, has promulgated fifteen factors to be applied in determining whether a gift has been provided. *See* 8 C.C.R. 1304–

2(IV)(B)(1). The BAA did not address any of these factors in its decision, and we do not make them a part of our analysis.