2013 COA 49

**LARIMER COUNTY BOARD OF COMMISSIONERS, Grand County Board of Commissioners, Board of Assessment Appeals, Petitioners–Appellees,**

v.

**COLORADO PROPERTY TAX ADMINISTRATOR, Respondent–Appellant,**

and

**YMCA of the Rockies, Intervenor–Appellant.**

**Court of Appeals Nos. 07CA0422 & 11CA0725**

Colorado Court of Appeals, Div. V.

Announced April 11, 2013

As Modified on Denial of Rehearing May 23, 2013

George H. Hass, County Attorney, Fort Collins, Colorado, for Petitioner–Appellee Larimer County Board of Commissioners.

Anthony J. DiCola, County Attorney, Robert Franek, Assistant County Attorney, Hot Sulphur Springs, Colorado, for Petitioner–Appellee Grand County Board of Commissioners.

John W. Suthers, Attorney General, Robert H. Dodd, Jr., Senior Assistant Attorney General, Grant T. Sullivan, Assistant Attorney General, Denver, Colorado, for Respondent–Appellant.

Bryan Cave HRO, Richard R. Young, Brent E. Rychener, Stuart J. Lark, Colorado Springs, Colorado, for Intervenor–Appellant.

Peter B. Nagel, P.C., Peter B. Nagel, Denver, Colorado, for Amici Curiae Catholic Health Initiatives Colorado, The Navigators, Christian Camp and Conference Association, and Young Life.

Opinion by JUDGE CARPARELLI

¶ 1 In this property tax exemption case, the Young Men's Christian Association of the Rockies (the YMCA) appeals the Board of Assessment Appeals orders finding that the YMCA is not entitled to a charitable use exemption or a religious purposes exemption from property taxes, except for its chapels and religious activity center. We conclude that the Board erred as a matter of law. We vacate the Board's order finding that the YMCA is not entitled to a charitable use exemption and is not entitled to a religious purposes exemption, except for the chapels and religious activity center. We remand for further proceedings consistent with this opinion.

## I. Background

¶ 2 The following facts are undisputed for the purposes of this appeal. The YMCA owns and operates facilities in Grand County and Larimer County. The first property, Snow Mountain Ranch, consists of 40 cabins, 12 vacation homes, and 61 campsites located on approximately 2,187 acres of land in Grand County. It also has a chapel, conference facilities, dining halls, a library, a swimming pool, athletic and recreational facilities, a laundromat, and maintenance and administration buildings.

¶ 3 The second property, the Estes Park Center, consists of 179 cabins, 25 vacation homes, and 451 lodge rooms located on approximately 860 acres of land in Larimer County near Rocky Mountain National Park. It also has a chapel, a museum, a library, conference facilities, auditoriums, dining halls, a swimming pool, a skate park and skating rink, a miniature golf course, a laundromat, and maintenance and administration buildings.

¶ 4 Snow Mountain Ranch and the Estes Park Center offer a wide variety of recreational activities, including hiking, fishing, mountain biking, snowshoeing, cross-country skiing, horseback riding, hayrides, swimming, tennis, ice skating, roller skating, basketball, softball, volleyball, miniature golf, ropes courses, fitness rooms, and crafts. The facilities also offer special activities and family programs, including Bible studies, worship services, archery, soccer, nature hikes, yoga, arts and crafts, story time at the library, scavenger hunts, and other games. Most activities are free or offered at nominal cost to guests. The YMCA gives arriving guests a list of all activities that are offered for the week, but does not require guests to participate in any of the activities or religious services.

¶ 5 In December 2003, the YMCA submitted applications for exemption from state

property tax for Snow Mountain Ranch and the Estes Park Center.[1] It asserted that large portions of both properties were entitled to exemption under the religious purposes and charitable use exemptions.

¶ 6 In February 2005, after a state property tax specialist analyzed the applications and conducted field inspections, the specialist recommended granting the religious purposes exemption for both properties, except for areas the YMCA did not include in the applications. The specialist did not consider the YMCA's request for a charitable use exemption at that time. In May 2005, the property tax administrator determined that the properties identified in the applications were used exclusively for religious purposes and, therefore, were exempt from taxation, effective as of January 1, 2002.

¶ 7 In June 2005, the Grand County Board of Commissioners, the Larimer County Board of Commissioners, and several individual property owners (collectively, the Counties) appealed the tax administrator's determination to the Board. They argued that the YMCA's use of the properties was commercial rather than religious.

¶ 8 The Board conducted a hearing in August 2006, and issued an order in February 2007 in which it affirmed the tax administrator's determinations that the chapels and religious activities center were exempt, but reversed the decision as to all other areas.

¶ 9 The YMCA appealed the Board's order to the Court of Appeals. A division of this court stayed the appeal to enable the tax administrator to rule on the YMCA's application for a charitable use exemption.

¶ 10 In October 2009, a state property tax specialist recommended granting the charitable use exemption for both properties, except with regard to a small percentage of guests who used the properties for non-exempt purposes. In November 2009, the tax adminis-

trator granted Snow Mountain Ranch a 96% exemption and the Estes Park Center a 97% exemption, based on their charitable nonresidential use.

¶ 11 As before, the Counties appealed the tax administrator's determination to the Board, asserting that the YMCA's use of the properties was not exclusively for charitable purposes. After the Board conducted a hearing in June 2010, it issued an order in March 2011 denying the charitable use exemption. The Board found that the YMCA had not provided sufficient documentation of its guests' actual use to support its application.

¶ 12 After the YMCA appealed the Board's order denying its application for a charitable use exemption, a division of this court lifted the stay on the YMCA's appeal regarding the religious purposes exemption. We now consider the consolidated appeals.

## II. Jurisdiction

¶ 13 The Counties argue that the YMCA does not have "standing to pursue [this] appeal[ ]" and that we do not have jurisdiction to entertain it. We conclude that we do have jurisdiction to hear the YMCA's appeal.

### A. Standing Versus Jurisdiction

¶ 14 The Counties use the terms "standing" and "jurisdiction" interchangeably in their briefs to argue that these appeals are not properly before us. However, as explained by the supreme court in *Maurer v. Young Life,* 779 P.2d 1317, 1323 (Colo.1989), standing and jurisdiction are distinct legal concepts.

¶ 15 Here, the Counties rely solely on section 39–2–117(6), C.R.S.2012, which pertains to appellate jurisdiction, not to standing.[2] Accordingly, we limit our analysis of

---

1. The applications covered the majority of the properties but did not include some areas that the YMCA conceded did not meet the requirements for the religious purposes or charitable use exemptions. Those areas, including residences of full-time, residential staff and property contracted to third-party vendors for commercial use, are not subject to the Board's orders and are not at issue in this appeal.

2. When determining whether a plaintiff has standing, we must consider (1) whether the plaintiff was injured in fact; and (2) whether the injury was to a legally protected right. *Maurer,* 779 P.2d at 1323. Because the Counties do not argue these elements, we conclude that the YMCA has standing to present this appeal.

the Counties' contention to whether we have jurisdiction to consider the appeals under section 39–2–117(6).

### B. Law

¶ 16 Section 39–2–117(5)(b), C.R.S.2012, provides:

> An appeal from any decision of the administrator may be taken by the board of county commissioners of the county wherein such property is located, or by any owner of taxable property in such county, or by the owner of the property for which exemption is claimed if exemption has been denied or revoked in full or in part. Any such appeal shall be taken to the board of assessment appeals pursuant to the provisions of section 39–2–125 no later than thirty days following the decision of the administrator.

¶ 17 "Section 39–2–117(6) outlines the availability of judicial review of Board decisions on appeals from the Administrator's determinations on property tax exemption applications." *Maurer*, 779 P.2d at 1321. This provision states:

> If the decision of the board is against the petitioner, the petitioner may petition the court of appeals for judicial review thereof according to the Colorado appellate rules and the provisions of section 24–4–106(11), C.R.S. If the decision of the board is against the respondent, the respondent, upon the recommendation of the board that it is a matter of statewide concern, may petition the court of appeals for judicial review according to the Colorado appellate rules and the provisions of section 24–4–106(11), C.R.S.

§ 39–2–117(6).

### C. The YMCA's Appeal

■ ¶ 24 The Counties also contend that we do not have jurisdiction to entertain the YMCA's appeal. Their argument is essentially the same as their argument regarding the tax administrator. The Counties sought Board review of the tax administrator's decision and the administrator responded, opposing the Counties' petition. The YMCA intervened, also opposing the petition. The Counties argue that as an intervenor, the YMCA is acting in the position of a respondent because its interests are aligned more closely with the tax administrator than with the Counties. The Counties also argue that, because the Board did not recommend that the matter is of statewide concern under section 39–2–117(6), the YMCA may not seek judicial review of the Board's decision. We disagree.

#### 1. Section 39–2–117(6)

¶ 25 Statutory interpretation is a matter of law we review de novo. *Churchill v. University of Colorado*, 2012 CO 54, ¶ 68, 285 P.3d 986. When the statutory language is clear, we apply its plain and ordinary meaning in a manner that gives effect to the General Assembly's intent, and construe each provision in context "as a whole to give 'consistent, harmonious and sensible effect to all [parts of the statute].'" *Bd. of County Commis v. Costilla County Conservancy Dist.*, 88 P.3d 1188, 1192–93 (Colo.2004) (quoting *People v. Luther*, 58 P.3d 1013, 1015 (Colo.2002)); *accord Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 223 (Colo.2005). In so doing, we must not apply a statute in a manner that leads to an illogical or absurd result. *State v. Nieto*, 993 P.2d 493, 501 (Colo.2000).

#### 2. Property Owner Applications and Appeals

¶ 26 When a property owner applies for a property tax exemption and the exemption is "denied or revoked in full or in part," section 39–2–117(5)(b) gives the property owner the right to appeal the denial to the Board.[3] When the Board also denies the application for exemption, section 39–2–117(6) gives the property owner, as petitioner, the right to appeal to the court of appeals for judicial review. Under section 39–2–117(6), the appeal is "according to the Colorado appellate rules and section 24–4–106(11)," the purpose of which is to "assure a plain, simple, and prompt judicial remedy to persons or parties

---

3. 8 Code Colo. Regs. 1301–1:6(a) of the Board's procedural rules refers to the document that initiates the appeal to the Board as a "petition."

Therefore, the party that appeals the tax administrator's denial of an exemption becomes the "petitioner."

adversely affected or aggrieved by agency actions." § 24–4–106(1), C.R.S.2012.

¶ 27 In this situation, application of section 39–2–117(5)(b) leads to a result that gives consistent, harmonious, and sensible effect to all parts of the statute and other statutes related to judicial review of agency decisions.

### 3. Petitions and Appeals by Counties and Other Property Owners

¶ 28 Section 39–2–117(5)(b) also gives "the board of county commissioners of the county wherein [the subject] property is located, [and] any owner of taxable property in such county" the right to appeal the tax administrator's determination. Unlike applicant property owners, who can appeal only *denials* of their applications, counties and other property owners can appeal *grants* of property owner applications.

### a. Tax Administrator and Property Owner Applicant Not Aligned

¶ 29 We reject the Counties' argument that the YMCA's interests are aligned with those of the tax administrator and that the YMCA should be treated as a respondent.

¶ 30 When considering a property owner's application, the tax administrator represents the state's interests, not those of the applicant property owner. When the tax administrator grants an owner's application and a county or another property owner obtains Board review, the tax administrator continues to be the state's representative and owes no duty to the applicant property owner. An applicant property owner who intervenes does so as the private party in interest, not as a representative of the state's interests.

¶ 31 The rationale underlying the limitation on the tax administrator's ability to seek judicial review only in matters of statewide importance does not logically apply to property owners. Thus, it is not surprising that nothing in the statute suggests that the General Assembly intended that the property owner be treated the same as the tax administrator.

### b. Applicant Property Owner's Interests

¶ 32 Just as a county or another property owner may be adversely affected when the Board grants an exemption, so too is a property owner when the Board denies the application for exemption. Indeed, permitting counties or other property owners to obtain judicial review of successive adverse decisions from the tax administrator and the Board, but not allowing the property owner to obtain judicial review when he or she first received a favorable decision from the tax administrator and then received an adverse one from the Board, is inconsistent and illogical.

¶ 33 Here, after the tax administrator granted the YMCA's exemptions, the Counties filed their petition for Board review. To protect its interests, the YMCA then intervened. The Board reversed the tax administrator and denied the exemptions. Had the Counties lost their appeal, the Counties and other property owners could have appealed to the court as "petitioners" under section 39–2–117(6). In contrast, the property owner whose application the Board denied, and who was neither the petitioner nor respondent before the Board, would be left without recourse. Leaving the property owner without recourse would be contrary to the General Assembly's declaration that "only the judiciary may make a final decision as to whether or not any given property is used for charitable purposes within the meaning of the Colorado constitution." § 39–3–101, C.R.S.2012.

### D. Conclusion

¶ 34 Literal application of section 39–2–117(6) would lead to the absurd result that applicants whose applications to the tax administrator are denied would have access to a judicial appeal while those whose applications are granted by the tax administrator but denied by the Board would not. It would also lead to the absurd result that a county or other property owner whose petition for Board review is unsuccessful would have the right to appeal, while an unsuccessful property owner claiming an exception would not.

¶ 35 It would also be absurd and illogical to treat the property owner as a respondent

because doing so would allow the very Board that denied the application for tax exemption to limit judicial review of its own decision.

¶ 36 Giving consistent, harmonious, and sensible effect to the entire statutory scheme, we conclude that section 39–2–117(6) must be applied to grant an applicant for tax exemption who receives a favorable ruling from the tax administrator, and, therefore, does not petition for Board review, the right to seek judicial review of an adverse Board decision.

¶ 37 For these reasons, we conclude that we have jurisdiction to hear the YMCA's appeal from the Board's determination.

### III. Religious Purposes Exemption

■ ¶ 38 The YMCA contends the Board erred when it found that the YMCA did not qualify for a religious purposes exemption. We conclude that the Board did not apply the proper legal standards.

### A. Law

¶ 39 The Colorado Constitution provides, "Property, real and personal, that is used solely and exclusively for religious worship … shall be exempt from taxation…." Colo. Const. art. X, § 5; *see also* § 39–3–106(1), C.R.S.2012 ("Property, real and personal, which is owned and used solely and exclusively for religious purposes and not for private gain or corporate profit shall be exempt from the levy and collection of property tax.").

¶ 40 To guide members of the public and public officials, to provide for a consistent application of the laws, and to assist in the avoidance of litigation, the General Assembly has declared that

- religious worship has different meanings to different religious organizations;
- the constitutional guarantees regarding establishment of religion and the free exercise of religion prevent public officials from inquiring as to whether particular activities of religious organizations constitute religious worship;
- many activities of religious organizations are in the furtherance of the religious purposes of such organizations;
- such religious activities are an integral part of the religious worship of religious organizations; and
- activities of religious organizations which are in furtherance of their religious purposes constitute religious worship for purposes of section 5 of article X of the Colorado Constitution.

§ 39–3–106(2), C.R.S.2012. The General Assembly has directed courts to give great weight to these findings and declarations. *Id.*

¶ 41 When applying for a religious purposes tax exemption, a property owner must include a declaration that sets forth its religious mission and religious purposes, as well as the uses of the property that are in the furtherance of such mission and purposes. § 39–2–117(1)(b)(II), C.R.S.2012.

Such declaration shall be presumptive as to the religious purposes for which such property is used.… The administrator may challenge any declaration included in the application only upon the grounds that the religious mission and purposes are not religious beliefs sincerely held by the owner of such property, that the property being claimed as exempt is not actually used for the purposes set forth in such application, or that the property being claimed as exempt is used for private gain or corporate profit.

*Id.*

■ ¶ 42 The Establishment Clause of the U.S. Constitution mandates equal treatment of different religious and secular actors. A tax that makes distinctions based on religious belief violates the Establishment Clause. *Catholic Health Initiatives Colorado v. City of Pueblo*, 207 P.3d 812, 818 (Colo. 2009). A statute violates the Establishment Clause when it fosters " 'an excessive government entanglement with religion.' " *Id.* (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)). " '[I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious.' " *Id.* (quoting *Corp. of Presiding*

*Bishop v. Amos,* 483 U.S. 327, 336, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987)).

¶ 43 Therefore, Colorado has adopted a broad view, exempting "necessarily incidental" property and activities of the religious organization entitled to a tax exemption. *Id.* (discussing *Maurer*); *Maurer,* 779 P.2d at 1332 (our precedents provide a policy of receptiveness toward exemptions implementing the constitutional policy of support for charitable and religious endeavors).

¶ 44 When determining whether to grant a property tax exemption, courts must decide each case on the facts presented. *Maurer,* 779 P.2d at 1330. We construe tax exemptions narrowly, and in favor of the taxing authority. *Catholic Health Initiatives Colorado,* 207 P.3d at 817. As a general rule, the presumption is against tax exemption and the burden is on the one claiming exemption to establish clearly the right to such relief. *Id.*

¶ 45 When determining whether properties qualify for a religious purposes exemption, the Board must examine how the owner uses the property, not the character of the owner. *Maurer,* 779 P.2d at 1331. However, "the character of the owner may often illuminate the purposes for which the property is used and need not be excluded from consideration." *Id.* (quoting *W. Brandt Found., Inc. v. Carper,* 652 P.2d 564, 567 (Colo.1982)) (holding that the Board permissibly considered the character of the property owner in concluding that the properties were used for religious worship and reflection).

### B. Standard of Review

¶ 46 We may set aside an order of the Board only when the Board abused its discretion or the order was arbitrary and capricious, based upon findings of fact that were clearly erroneous, unsupported by substantial evidence, or otherwise contrary to law. § 24-4-106(7), C.R.S. 2012; *Boulder County Bd. of Commis v. HealthSouth Corp.,* 246 P.3d 948, 951 (Colo.2011).

¶ 47 Generally, the Board's findings of fact are entitled to deference unless they are unsupported by competent evidence or reflect a failure to abide by the statutory scheme for property tax assessment. *Family Tree Found. v. Prop. Tax Adm'r,* 119 P.3d 581, 582 (Colo.App.2005) (citing *Bd. of Assessment Appeals v. E.E. Sonnenberg & Sons, Inc.,* 797 P.2d 27 (Colo.1990)).

¶ 48 Nonetheless, the meaning and scope of statutory provisions are questions of law, which we review de novo. *HealthSouth Corp.,* 246 P.3d at 951. Our duty is to effectuate the intent of the General Assembly in enacting the law. *Id.*

### C. Facts Relevant to Religious Purposes Exemption

¶ 49 The YMCA's articles of incorporation state that its primary purpose is

> to provide a Christian environment and the necessary facilities and equipment to hold religious and educational conferences in the interests of youth; to foster in every way possible the interests and program of the Young Men's Christian Associations; and, to provide a program for family groups under Christian leadership.

¶ 50 The articles also provide that the YMCA "is organized exclusively for charitable, religious and educational purposes" and "shall not be operated for profit."

¶ 51 To that end, the YMCA has adopted the following mission statement:

> The YMCA of the Rockies puts Christian principles into practice through programs, staff and facilities in an environment that builds healthy spirit, mind and body for all. We will accomplish this by serving conferences of a religious, educational or recreational nature, providing unifying experiences for families, offering traditional summer camping experiences for boys and girls, and serving our staff with leadership opportunities and productive work experiences.

¶ 52 The YMCA has also adopted four core values: "caring, honesty, respect and responsibility." In 2004, the YMCA added "faith" as a fifth core value.[4]

---

**4.** Not all marketing and training materials include the word "faith" as a core value.

¶ 53 The YMCA's application for tax exemption summarizes its mission and principles as follows: "Simply put, YMCA of the Rockies accomplishes its mission by providing a Christian environment that demonstrates and promotes Christian principles." The YMCA believes that providing a Christian environment "prepares the soil" for spiritual growth in the lives of many guests by promoting Christian principles shared by all.

¶ 54 The YMCA says in its application that guests who "may have no particular religious interests connected with their visit" are "particularly important to YMCA's religious mission because they are the ones that YMCA has a unique ability to influence." To that end, the YMCA presented evidence that it purposely offers hospitality at both facilities to all individuals, regardless of their religious affiliation, if any. Both facilities employ chaplains who offer an array of religious services, studies, and programs, both at their properties and within the local communities.

### D. Board's Findings

¶ 55 The Board found that, except for the chapels and religious activities center, Snow Mountain Ranch and the Estes Park Center are not used "solely and exclusively" for religious purposes. The Board found that both facilities are open to the general public "regardless of faith or lack of faith," and that they are marketed "without any mention of religion." The Board also found that many guests do not participate in "any overtly Christian activities or believe that they are ensconced in a Christian environment." The Board further found that the "YMCA's own records evidence that groups with no patently Christian purpose utilize YMCA facilities."

¶ 56 The Board also found that the YMCA is "strictly forbidden from [providing] any religious content" to public school children with access to its facilities: "The very notion that public school children may be exposed to a religious message or to a 'Christian environment' violates the religious neutrality requirement of the public school system."

¶ 57 Similarly, the Board found that the YMCA accepted bond funds and agreed not to use the funds "primarily for pervasively sectarian purposes."

¶ 58 The Board contrasted the YMCA's application with Young Life's application in *Maurer*. According to the Board, Young Life provided evidence that more than 95% of the participants in its youth camps did so as part of a religious program and 93% of the guests were part of a religious program. In addition, compared to Young Life's control of the events attended by 70% of its campers the YMCA does not control a majority of the programs that occur within its facilities. The Board also said that there was no indication that Young Life accepted public bonds. Finally, the Board noted that the *Maurer* decision relied on language that no longer exists in the current statute.

### E. Analysis and Conclusions

¶ 59 We conclude that the Board did not apply the proper legal standards and, therefore, erred as a matter of law.

¶ 60 The majority of the Board's order identifies evidence in the record related to the YMCA's application. However, in its analysis, the Board does not address the YMCA's declaration of religious purposes contained in its application, the effect of the declaration's presumed validity, or whether the presumption had been overcome. Because such declarations are presumptive with regard to the religious purposes for which property is used under section 39–2–117(1)(b)(II), the Board erred as a matter of law.

¶ 61 In addition, the Board summarily cites *Maurer* for the proposition that it must examine the actual use to which the property is put, not the character of the owner. *See Maurer*, 779 P.2d at 1331. However, immediately after the two sentences the Board cites from *Maurer*, the supreme court continues:

> Thus, although not all the activities conducted on the Young Life properties are inherently religious in nature, by considering the character of the owner and the competent evidence in the record that the uses of the properties were to advance in an informal and often indirect manner Young Life's purposes, including promotion of an evangelistic Christian testi-

mony among adolescents, the Board could and did conclude that any nonreligious aspects of these activities were necessarily incidental to the religious worship and reflection purposes for which Young Life claimed the properties were used.

*Id.*

¶ 62 The *Maurer* court's discussion, and the Board findings attached to that opinion, show that the Board considered Young Life's use of the property in light of its declared purpose, as reflected in its evidence, including its articles of incorporation. *Id.* at 1332.

¶ 63 Here, in contrast, the Board does not discuss YMCA's declared purpose in using the properties. Nor does the Board discuss whether the YMCA's activities are "in furtherance of [the YMCA's] religious purposes," or whether the activities "are an integral part of [the YMCA's] religious worship." Because activities of religious organizations that further their religious purposes constitute religious worship for purposes of the Colorado Constitution, § 39–3–106(2), the Board must consider those activities when considering whether the tax administrator properly found the YMCA's property to be exempt.

¶ 64 Instead, the Board relied on selective evidence regarding (1) some guests' purposes, subjective experiences, and choices during their stays; (2) access by public school children to the properties, without any findings that those groups were, in fact, subject to religious programs; (3) the YMCA's receipt of bond funds, without finding that the use of the funds was improper or not in furtherance of the YMCA's religious purposes; (4) the YMCA's lack of control over a "majority of the programs" within its facilities; and (5) the YMCA's marketing to the public without advertising religion. We conclude the Board's analysis is insufficient and misapplies the correct legal standards.

¶ 65 In addition, the Board's approach would foster "an excessive government entanglement with religion," and therefore, violates the Establishment Clause. *See Catholic Health Initiatives Colorado*, 207 P.3d at 818. This case illustrates the significant burden of requiring a religious organization to predict which of its activities a secular court will consider religious. *See id.; see also Corp. of Presiding Bishop*, 483 U.S. at 336, 107 S.Ct. at 2868.

¶ 66 The correct legal inquiry is set forth in sections 39–2–117 and 39–3–106. The tax administrator, and then the Board, must review the property owner's application and evidence to determine whether the owner's use of the property is for a religious purpose, consistent with the owner's declaration of its religious mission and purpose.

¶ 67 Accordingly, we conclude the Board did not apply the proper legal standards when it found that the YMCA did not qualify for a religious purposes exemption.

¶ 68 Because the Counties do not dispute the Board's finding that the chapels and religious activities center qualify under the religious purposes exemption, we affirm that portion of the Board's order. However, we vacate the Board's order regarding its finding that the "remainder of the subject property does not meet the qualifications for exemption," and remand for further proceedings.

## IV. Charitable Use Exemption

¶ 69 The YMCA contends that the Board erred when it found that the YMCA did not qualify for a charitable use exemption. Again, the Board did not apply the correct legal standards.

### A. Law

¶ 70 The Colorado Constitution provides, "Property, real and personal, that is used solely and exclusively for . . . strictly charitable purposes . . . shall be exempt from taxation." Colo. Const. art. X, § 5; *see also* § 39–3–108(1)(a), C.R.S.2012 ("Property, real and personal, which is owned and used solely and exclusively for strictly charitable purposes and not for private gain or corporate profit shall be exempt from the levy and collection of property tax if such property is nonresidential.")

¶ 71 According to regulations issued by the Department of Local Affairs Division of Property Taxation:

"Charity" means a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.

8 Code Colo. Regs. 1304–2(IV)(A). This definition is taken verbatim from *Jackson v. Phillips,* 96 Mass. 539, 556 (1867), which Colorado appellate courts "have consistently harkened back to" in reviewing charitable use exemption issues. *Bd. of Assessment Appeals v. AM/FM Int'l,* 940 P.2d 338, 343–44 (Colo.1997).

¶ 72 Eligibility for exemption is determined by examining the use to which the property is put, not the character of the owner. *W. Brandt Found.,* 652 P.2d at 567. However, the character of the owner may often illuminate the purposes for which the property is used and need not be excluded from consideration. *Id.* at 567–68. Courts strictly construe whether the purpose is charitable. However, when the purpose is clearly charitable, we liberally construe the means that are permitted to achieve that purpose. *Id.* at 568.

¶ 73 "The determination as to whether property is used for 'strictly charitable purposes' must be made on a case-by-case basis to determine whether such use satisfies the statutory and constitutional requirements." *AM/FM Int'l,* 940 P.2d at 347; *see also* § 39–3–101 ("The general assembly recognizes that only the judiciary may make a final decision as to whether or not any given property is used for charitable purposes within the meaning of the Colorado constitution.")

### B. Standard of Review

¶ 74 The Board's findings of fact are entitled to deference except when they are not supported by competent evidence or reflect a failure to abide by the statutory scheme for property tax assessment. *Family Tree Found.,* 119 P.3d at 582. We are not bound by the Board's interpretation of law where it is inconsistent with the clear language of the statute or legislative intent. *Id.*

### C. Facts Relevant to Charitable Use Exemption

¶ 75 The YMCA contends that it qualifies for a charitable use exemption because (1) the activities and facilities at the properties further charitable purposes and benefit the public, and (2) its financial model relies on contributions and volunteer services to provide a "gift."

¶ 76 To this end, the YMCA presented evidence that it offers financial assistance and scholarships for charitable and governmental guests, individuals affected by unemployment and financial hardship, and that it has a policy that no child will be turned away for financial reasons. In addition, it offers the following activities and uses at its properties:

- Charitable, educational, and governmental retreats and conferences, including those for the Colorado National Guard, United States Army, Division of Wildlife, Estes Park Police Department, Denver Housing Authority, the University of Colorado School of Medicine, Boy Scouts, Girl Scouts, church and other religious groups, and public schools.
- Camp Chief Ouray, which is a ten-week residential youth summer camp;
- Specialty camps, including those for children with special needs, children with Down's syndrome, families with adopted multinational children, Children's Hospital burn survivors, children with kidney disease, and Brachial Plexus family camps;
- Military programs for veterans;
- Programs for the profoundly deaf;
- Licensed daycare center;
- Kidney dialysis treatment center that provides regular treatment to guests so they can participate in activities;
- A safehouse for Grand County;
- Temporary shelter provided in partnership with Good Samaritan;
- Circle of Friends Montessori School;

- Outdoor educational programs;
- Family activities provided at no or low cost; and
- Gymnasium and exercise facilities for local community members.

¶ 77 According to the YMCA's evidence, it relies on donations equal to 10% of annual revenue to maintain its facilities, and its fundraising expenses account for approximately 13% of its budgeted costs. The YMCA charges charitable groups less than an equitable portion of the reasonable operations and maintenance expenses. The YMCA presented evidence that it structures its fees based on estimated expenses for maintenance, operations, and half of the anticipated capital expenditures. It does not raise its rates to exceed expenses, and any excess revenue is used for facility replacement. According to YMCA witnesses, if revenue is short, the YMCA reduces maintenance. YMCA witnesses explained that the YMCA's goal is to maintain an even cash flow and the YMCA does not set its rates based on the market.

¶ 78 YMCA witnesses also testified that, without donations and volunteer support, the YMCA would be insolvent and bankrupt. It often borrows money for large improvement projects and issues tax exempt bonds to construct new cabins. When determining its budget, the YMCA gives priority to defraying program costs for charitable participants and maintaining a policy that no child be turned away for financial reasons.

¶ 79 Although the YMCA does not track how guests use its facilities, most guests are in groups of fifteen or more and are religious or church groups. Non-conference guests account for only 12% of available lodging at Snow Mountain Ranch and 16% at the Estes Park Center.

### D. Board's Findings

¶ 80 The Board found that the tax administrator wrongly applied the "a statutory presumption against exemption" and that the YMCA did not present sufficient evidence regarding its actual use of the properties.

¶ 81 The Board also found that the YMCA used "an overly broad definition" for charita-

ble uses that included "all uses by families except 6% of the families who stated in [a survey] that they did not participate in YMCA activities." The Board "was not convinced that organizations with charitable or religious names necessarily used the facility for a corresponding charitable use." Therefore, "[w]ithout such documentation, the Board has to assume that the use is non-qualifying, based on the presumption against exemption."

¶ 82 The Board also found that, even if the YMCA had qualified for an exemption, it lost its exempt status because its non-exempt use exceeded the amount of occasional, non-exempt use allowed by statute. As a result, the Board found that the properties did not qualify for a charitable use exemption in their entirety. The Board did not determine whether the YMCA was entitled to a partial charitable use exemption.

### E. Analysis and Conclusions

¶ 83 We conclude that the Board did not apply the correct legal standards and, therefore, erred as a matter of law.

¶ 84 In its order, the Board repeatedly said that it was applying a statutory presumption against exemption in this case. However, this presumption was not accurate in light of the applicable constitutional provisions and more recent supreme court authority. The Colorado Constitution provides that property that is used solely and exclusively for strictly charitable purposes shall be exempt from taxation. Colo. Const. art. X, § 5. To that end, we strictly construe what constitutes a charitable purpose but liberally construe the means used to achieve it. *W. Brandt Found.*, 652 P.2d at 568.

¶ 85 Here, the Board's order focused almost exclusively on whether family use of the YMCA, presumably as overnight guests, constitutes a charitable use. This use, which is approximately 12% of available lodging at Snow Mountain Ranch and 16% at the Estes Park Center, is not the sole or primary use of the properties. The Board found that 6% of surveyed families said that they did not participate in YMCA activities. However, an entity can use its facilities for charitable pur-

poses without requiring participation in entity-organized activities. *See, e.g., id.* at 570 ("If use by other groups were merely incidental to the primary purpose to which the facility was being put, this would not by itself defeat exemption."). Even if participation in YMCA activities were legally required, the evidence indicates that use by overnight family guests who said they did not participate in YMCA activities represents less than 1% of the YMCA's stated use of the properties.

¶ 86 In addition, the Board did not address the majority of activities that the YMCA asserted, and the tax administrator determined, were charitable purposes of the properties. For example, the Board did not address the specific camps and programs offered by the YMCA to charitable and governmental organizations, the kidney dialysis center, or the services provided to the local communities, including the safe house and temporary shelter. Nor did the Board consider the YMCA's financial model, its fee and scholarship programs, or its reliance on contributions and volunteer services to determine whether it used the properties for private gain or corporate profit.

¶ 87 In its order, the Board relied on "Gray's rule," [5] which it said "was codified in statute under Section 39–3–108(1)(a)." However, "Gray's rule" has not been codified in the statute, and section 39–3–108(1)(a) is silent regarding what constitutes a charitable "gift." In addition, the Board did not address the majority of the YMCA's purported charitable uses of the properties. Nor did the Board apply the applicable constitutional provisions and Division of Property Tax regulations to determine whether the YMCA was entitled to a partial charitable use exemption.

¶ 88 Section 39–3–106.5, C.R.S.2012, provides that if a charitable property is also used for non-exempt purposes for fewer than 208 adjusted hours or the non-qualifying purposes result in less than $25,000 [6] of gross rental income in a year, the property maintains its full exempt status.

¶ 89 However, the Department of Local Affairs adopted regulations to implement the statutes related to exempt properties. In them, the Department specifically provides that applications for charitable use exemptions "may be adjusted for partial usage" and provides specific formulas for calculating partial usage. 8 Code Colo. Regs. 1304–2(I)(B)(27).

¶ 90 Applying section 39–3–106.5, the Board concluded that the YMCA did not qualify for any exemption based on the amount of its non-exempt use. Assuming without deciding that the Board correctly applied the statute to determine that the YMCA exceeded the adjusted hours or gross rental income for non-exempt use to entitle it to fully exempt status, we conclude the Board then should have considered whether the YMCA was entitled to a partial charitable use exemption. Because it did not, the Board erred as a matter of law.

¶ 91 Based on the record, we conclude that the Board did not properly consider whether the YMCA used the properties solely and exclusively for strictly charitable purposes. *See AM/FM Int'l,* 940 P.2d at 347. Accordingly, we conclude the Board did not apply the proper legal standards when it found that the YMCA did not qualify for a charitable use exemption.

## V. Remand

¶ 92 The YMCA contends that remand is unnecessary because the relevant facts are undisputed, and that under our standard of review, we may conclude as a matter of law that the YMCA is entitled to one or both exemptions. Therefore, the YMCA asks us to uphold the tax administrator's determinations. We are not persuaded.

¶ 93 Although we agree that the Board did not apply the correct legal standards, we cannot conclude that the tax administrator's findings necessarily should be reinstated.

¶ 94 These are complex applications that involve a significant amount of evidence and testimony. Although the parties did not dispute the Board's factual findings for the pur-

---

5. "Gray's rule" defines what constitutes a "charitable gift" for tax exemption purposes.

6. Before being amended in 2004, the limitation was $10,000 in a year.

pose of this appeal, the evidence in the record remains disputed. The YMCA presented evidence to support its application for tax exemptions and the Counties presented evidence to support their theory that the properties are resort accommodations that are not used for religious or charitable purposes.

¶ 95 The Board did not make findings regarding the credibility, weight, and significance of all the disputed evidence. And there appears to be a dispute about which evidence is relevant to the Board's review of the tax administrator's determinations under the correct legal standards.

¶ 96 Moreover, both the religious purposes and charitable use exemptions allow for partial exemptions. Therefore, remand is necessary because we cannot make the factual findings required to review the tax administrator's determinations.

## VI.   Conclusion

¶ 97 The Board's order regarding the YMCA's religious purposes exemption is affirmed with respect to the chapels and religious activity center. The same order is vacated in all other respects.

¶ 98 The Board's order denying the YMCA a charitable use exemption is vacated.

¶ 99 The cases are remanded for further proceedings consistent with this opinion. On remand, the Board must apply the correct legal standards and review the tax administrator's determination regarding whether the YMCA is entitled to a full or partial religious purposes exemption or charitable use exemption for the remaining portions of the properties contained in its applications. On remand, the Board may decide whether it will accept additional evidence or conduct further hearings.

JUDGE MILLER and JUDGE FOX concur.