The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
June 28, 2018

## 2018COA91

**No. 17CA0341 Children's Hospital Colorado v. Property Tax
Administrator and Colorado Board of Assessment Appeals —
Taxation — Property Tax — Exemptions — Child Care Centers**

In this property tax exemption case, Children's Hospital

Colorado appeals the denial of its property tax exemption

application for a day care center (Center) it operates. A division of

the court of appeals concludes that the Board of Assessment

Appeals properly interpreted section 39-3-110(1)(e), C.R.S. 2017,

which governs property tax exemptions for child care centers, to

conclude that the Center's tuition discount policy did not qualify as

offering services "on the basis of ability to pay." Because the tuition

breaks offered by the Center were static discounts as opposed to a

scale that "required the use of a graduated series of total cost for

each child based on the financial status of the recipient," as

required by the Property Tax Administrator's rules, the Center did not charge "on the basis of ability to pay," and consequently did not qualify for tax exemption under section 39-3-110(1)(e).  The division also affirms the Board of Assessment Appeals' decision that the Center was not used for a strictly charitable purpose under section 39-3-108(1), C.R.S. 2017.

COLORADO COURT OF APPEALS                                            **2018COA91**

Court of Appeals No. 17CA0341
Colorado State Board of Assessment Appeals No. 68840

Children's Hospital Colorado,

Petitioner-Appellant,

v.

Property Tax Administrator,

Respondent-Appellee,

and

Colorado State Board of Assessment Appeals,

Appellee.

ORDER AFFIRMED

Division I
Opinion by CHIEF JUDGE LOEB
Vogt* and Casebolt*, JJ., concur

Announced June 28, 2018

Spencer Fane, LLP, Ellen Elizabeth Stewart, Ann M. Schroeder, Denver, Colorado, for Petitioner-Appellant

Cynthia H. Coffman, Attorney General, Robert H. Dodd, Russell D. Johnson, Assistant Solicitors General, Denver, Colorado, for Respondent-Appellee

Cynthia H. Coffman, Attorney General, Emmy A. Langley, Assistant Solicitor General, Denver, Colorado, for Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2017.

¶ 1 Children's Hospital Colorado (Hospital) appeals the final order of the Colorado State Board of Assessment Appeals (BAA) upholding the order of the Property Tax Administrator (PTA) denying the Hospital's property tax exemption application for a child care center (Center) it owns and operates. The Hospital argues on appeal that the BAA exceeded its authority in interpreting section 39-3-110(1)(e), C.R.S. 2017, to conclude that the Center's tuition discount policy did not qualify the Center for an exemption under that section, and that the BAA improperly concluded that the Center was not used for a strictly charitable purpose under section 39-3-108(1), C.R.S. 2017. We affirm the BAA's order.

I. Background and Procedural History

A. The Center

¶ 2 The Hospital owns and operates the Center, a child care facility on the University of Colorado Anschutz Medical School (CU Anschutz) campus. The Center was developed by the Hospital with assistance from the University of Colorado (the University). The Hospital and the University entered into a contract for construction and operation of the Center, under which the Hospital agreed to operate the Center for the primary purpose of providing child care

1

services to the constituents of the Hospital and CU Anschutz. As acknowledged by the Hospital, both in the administrative proceedings and on appeal to this court, "[t]he purpose of the Center is to provide child care to constituents of the Hospital and [CU Anschutz] as an employee benefit to attract and retain quality employees so that the hospitals can better serve their patients." Accordingly, the record shows that a vast majority of the Center's available enrollment slots are reserved for children of employees, staff, and students at the Hospital and CU Anschutz; there are additional slots allotted to children of employees of Fitzsimons Redevelopment Authority (Fitzsimons) because the Center is located on the site of the old Fitzsimons Army Medical Center. In addition, remaining enrollment slots at the Center are prioritized for children of employees who work at the Center and children from other entities associated with the Hospital and CU Anschutz.

¶ 3    The Hospital contracted with Bright Horizons Children's Centers LLC (Bright Horizons) to run the day-to-day operations of the Center. Bright Horizons is a for-profit entity and receives compensation from the Hospital to operate the Center; the amount

Bright Horizons receives from the Hospital is determined by contract. Parents pay tuition directly to Bright Horizons.

¶ 4 The Center has a written tuition assistance policy that purportedly defines "how enrolled families may be eligible for discounted tuition rates." In this policy, families are informed that "[t]uition assistance, based on a family's income, size, and the number of children in a family enrolled at the Center, is available." The tuition assistance policies at issue in this appeal are "Income Assistance" and "Sibling Discount." The income assistance policy gives all families with an income below 150% of the federal poverty level (federal poverty line) a flat 10% tuition discount. The sibling discount is a flat 5% discount for siblings of enrolled children, regardless of the family's income.

B. Application Process and Appeal to the BAA

¶ 5 The Hospital filed an application for exemption from property tax for the Center under section 39-3-108(1)(b), an exemption for health care facilities. However, because the Center is not a licensed health care facility, that exemption was facially not applicable to the Center.

3

¶ 6      Under the rules and regulations of the Division of Property

Taxation (Division),[1] when an application is submitted under a

particular statute and that statute is not applicable, an investigator

for the Division can consider whether the property qualifies for

exemption under a different statute.  Div. of Prop. Taxation Rule

I.B.11, 8 Code Colo. Regs. 1304-2.  Thus, the investigator assigned

to the Hospital's application considered the Hospital's application

under section 39-3-108(1)(a), an exemption for a nonresidential

property operated for strictly charitable purposes, and section 39-3-

110, an exemption for qualified child care centers.

¶ 7      In October 2014, the PTA issued a tentative determination

denying the Hospital's application, finding that the Center was not

used for strictly charitable purposes because it did not benefit an

indefinite number of persons; the denial was also based on the

Hospital's failure to show that the Center provided its services for

free or on the basis of ability to pay under section 39-3-110(1)(e).  In

response to this tentative determination, the Hospital filed

supplemental financial information, including information on the

---

[1] These rules and regulations are promulgated by the PTA.  § 39-2-
117(7), C.R.S. 2017; Div. of Prop. Taxation, Legal Authority, 8 Code
Colo. Regs. 1304-2.

4

Center's tuition discount policy and demographics of the children enrolled at the Center.

¶ 8    In April 2016, the PTA issued a final decision denying the Hospital's application for the Center.  The PTA denied the application because the Hospital's "financial figures arising from the usage of this property do not qualify it for exemption under subsection (1)(e) of C.R.S. 39-3-110.  Furthermore, its usage of the property does not satisfy the requirements under Rule IV.B.1 and C.R.S. 39-3-108(1)(a)."[2]

¶ 9    Pursuant to section 39-2-117(5)(b), C.R.S. 2017, the Hospital exercised its right to appeal to the BAA.  The BAA held a hearing on the matter in November 2016.  The Hospital presented several witnesses at the hearing, including the Hospital's Chief Financial Officer, the Hospital's Director of Human Resource Operations, the Director of the Center, and CU Anschutz's Director of Initiatives.  These witnesses testified as to the purposes of the Center, the Center's enrollment demographics, and details of the tuition assistance policy.  Relevant to the present appeal and the BAA's

---

[2] "Rule IV.B.1" refers to the Division's rule concerning requirements for a property's use for strictly charitable purposes.

order, the Hospital presented the following information at the hearing:

- In her opening statement, the Hospital's counsel stated that the Center "is a daycare center *for the faculty and students* of the [CU Anschutz] campus. The evidence will show that in order for [CU Anschutz] to recruit and maintain exceptional faculty and students . . . it needs to provide a benefit, such as the [Center]." (Emphasis added.)

- There are 248 enrollment slots available at the Center.

- The majority of enrollment slots at the Center are reserved for children of employees, students, and staff at the Hospital and CU Anschutz.

- Enrollment slots are prioritized in the contract between the Hospital and Bright Horizons as follows: (1) reserved spaces for children of the Hospital's employees, children of CU Anschutz employees, and children of Fitzsimons employees; (2) siblings of the Hospital's employees' children enrolled at the Center; (3) children of Bright Horizons staff employed at the Center; (4) "other priorities

6

agreed to by" the Hospital and Bright Horizons; and (5) children from the community.

- According to testimony from the Hospital's Chief Financial Officer, "children from the community" are considered to be any enrolled children from "outside [CU Anschutz] and then anyone outside of [the Hospital]." This includes children of employees of Fitzsimons; children of employees of the organization that provides billing services for physicians at CU Anschutz (UPI); children of employees of UC Health (UCH), the University of Colorado Hospital Authority; children of Bright Horizons staff; and children from the general community. Thus, "children from the community" primarily includes groups of children whose parents are associated with the Hospital or CU Anschutz, several of which are already included in prioritized categories for enrollment slots.

- An exhibit identifying the above groups as categories showed the breakdown of children enrolled at the center during 2014, the relevant period at issue here. Notably, no children from the general community were enrolled

after children in all other prioritized categories (the Hospital, CU Anschutz, Fitzsimons, Bright Horizons, UPI, and UCH) were enrolled.

- As of November 2014, there were 305 children on the waiting list for enrollment at the Center: 281 from the Hospital and CU Anschutz, and only one from the general community (the 23 others were from UCH and UPI).

- The Hospital pays Bright Horizons fees to maintain and operate the Center. Bright Horizons receives a 3 to 5% profit from these fees. However, the Hospital operates the Center at a loss.

- The Hospital's witnesses could not say how many children, if any, received the written tuition assistance discount based on the federal poverty line. However, four children received a 50% tuition discount that was not covered by the written policy and was based entirely on the discretion of the Center's Director. There were no set criteria for this 50% discount, and it was not disclosed on the Center's website or in the enrollment paperwork. At

8

least two of the children who received the 50% discount were children of Bright Horizons employees.

- There are child care centers available on at least two other University campuses. These centers are "auxiliary" programs, which means that they function only on their ability to collect tuition from the parents. The Hospital witnesses could not say if these child care centers were available to the general community or limited to University students and faculty; they also could not say if the centers were run by the University or a third party such as Bright Horizons, or if the centers were "part of" the University.

¶ 10    Counsel for the PTA called one witness, Stan Gueldenzopf, the Manager of the Division's exemption section. Gueldenzopf testified as to the Hospital's application and why the investigators concluded that the Center was not eligible for exemption under section 39-3-110 or section 39-3-108(1)(a). As to section 39-3-110, Gueldenzopf focused his testimony on subsection (1)(e), which requires that a child care center offer its services at rates based on the recipient's

ability to pay, because that was the basis for the PTA's denial as listed on the final determination.

¶ 11 Referring to the Division's definition of "charges on the basis of ability to pay" provided in its rules and regulations, Gueldenzopf testified that in his experience, a "scale" that would consider a family's financial status and ability to pay the required tuition would need to be based on multiple factors, such as income and family size, and offer a range of several tuition rates. He concluded that the Center's federal poverty line discount was not "adequate" because it only took into account one element — family income as compared to the federal poverty line. In his testimony, he provided examples of how the Center's federal poverty line discount would actually work, which highlighted the fact that the discount was not "reflective of . . . [a] family's ability to pay." Gueldenzopf concluded that the federal poverty line discount offered by the Center was not a "scale," as referred to in the applicable Division rules and regulations.

¶ 12 Throughout the hearing, the Hospital argued that the Center met the requirement of subsection (1)(e) because of its federal poverty line and sibling discount policies. The Hospital focused its

argument on the poverty line discount and asserted that the Division had not specified, through its rules and regulations or in its correspondence with the Hospital, a definition of the term "scale," nor had it stated that a scale required a range of tuition options. Thus, it argued, the federal poverty line discount was a scale because it measured a family's ability to pay through income. The Hospital also argued that the Center was used for strictly charitable purposes because it provided a "gift" to the public and because it lessened the burdens of government.

## C.  BAA Final Order

¶ 13    In February 2017, the BAA issued an order upholding the PTA's determination that the Hospital was not entitled to exemption from property taxes for the Center because it did not charge for its services based on the recipient's ability to pay as required by section 39-3-110(1)(e), and because the Center was not used for strictly charitable purposes as required by 39-3-108(1).

¶ 14    Regarding section 39-3-110(1)(e), the BAA found that the Center did not charge families tuition based on their ability to pay. It specifically credited Gueldenzopf's testimony discussing scales that charge on the basis of ability to pay, and it concluded that,

11

based on that testimony and the Division's definition of "charges on the basis of ability to pay" in Division of Property Taxation Rule IV.E.5, 8 Code Colo. Regs. 1304-2, such scales "required the use of a graduated series of total cost for each child based on the financial status of the recipient." The BAA found that the Center's tuition assistance based on the federal poverty line did not meet that requirement because parents with a stronger financial status paid the same as parents with a significantly weaker financial status, and the BAA further provided examples of scenarios to illustrate this point.

¶ 15    Under section 39-3-108 and Colorado's constitutional provision on property tax exemptions, the BAA found that, based on the Hospital's own statements, the Center was operated for the business purposes of providing a recruitment tool and employee benefit for the Hospital and CU Anschutz; that the Center's services were not provided to an indefinite number of persons, but were largely, if not solely, dependent on the recipient's voluntary association with certain groups; that the minimal tuition assistance provided indicated that the Center was not being operated for a charitable purpose; that the Center was, at least in part, operated

12

for corporate profit because Bright Horizons made a 3 to 5% profit from the fees paid to it by the Hospital; and that the Center did not lessen the burdens of government because the evidence presented at the hearing did not show that CU Anschutz (i.e., the State of Colorado) would be required to provide a child care center at taxpayer expense if the Hospital did not operate the Center.

¶ 16    The Hospital now appeals the BAA's final order pursuant to section 39-2-117(6).

## II.    Constitutional and Statutory Framework

¶ 17    We begin by summarizing the legal framework that governs property tax exemptions in Colorado and the issues in this case.

¶ 18    "Each claim for tax exemption must be determined upon the facts presented and in light of the applicable constitutional and statutory provisions." *Bd. of Assessment Appeals v. AM/FM Int'l*, 940 P.2d 338, 343 (Colo. 1997).

¶ 19    The state's ability to exempt personal and real property from taxes derives from the Colorado Constitution: "Property, real and personal, that is used solely and exclusively for religious worship, for schools or for strictly charitable purposes . . . shall be exempt from taxation, *unless otherwise provided by general law.*" Colo.

13

Const. art. X, § 5 (emphasis added). Courts have consistently concluded that the language "unless otherwise provided by general law" gives the General Assembly the ability and power "to limit, modify, or abolish" constitutional exemptions. *McGlone v. First Baptist Church of Denver*, 97 Colo. 427, 431, 50 P.2d 547, 549 (1935); *Anderson Ranch Arts Found. v. Prop. Tax Adm'r*, 729 P.2d 992, 994 (Colo. App. 1986) (citing *McGlone*, 97 Colo. at 431, 50 P.2d at 549).

¶ 20     The BAA concluded that the Center did not qualify for exemption under section 39-3-110's requirements for child care centers. The BAA also determined that the Center was not used for strictly charitable purposes as contemplated by the Colorado Constitution and section 39-3-108(1)(a). Accordingly, both section 39-3-110 and section 39-3-108(1)(a) are relevant to this appeal.

¶ 21     Section 39-3-110 provides a property tax exemption if such property is used

> as an integral part of a child care center:
>
> (a) Which is licensed pursuant to article 6 of title 26, C.R.S.;

14

(b) Which is maintained for the whole or part of a day for the care of five or more children who are not sixteen years of age or older;

(c) Which is not owned or operated for private gain or corporate profit;

(d) The costs of operation of which, including salaries, are reasonable based upon the services and facilities provided and as compared with the costs of operation of any comparable public institution;

(e) Which provides its services to an indefinite number of persons free of charge or at reduced rates equal to five percent of the gross revenues of such child care center or equal to ten percent of the amount of tuition charged by such child care center to the financially needy *or charges on the basis of ability to pay*;

(f) The operation of which does not materially enhance, directly or indirectly, the private gain of any individual except as reasonable compensation for services rendered or goods furnished;

(g) The property of which is claimed for exemption does not exceed the amount of property reasonably necessary for the accomplishment of the exempt purpose; and

(h) The property of which is irrevocably dedicated to a charitable purpose.

§ 39-3-110(1) (emphasis added).

¶ 22    Both the PTA and the BAA based their decisions to deny the Hospital's application for property tax exemption for the Center

15

under section 39-3-110 entirely on the Center's failure to meet the requirement in subsection (1)(e) that it "charges on the basis of ability to pay."

¶ 23    Section 39-3-108 provides as follows:

> (1) Property, real and personal, which is owned and *used solely and exclusively for strictly charitable purposes* and not for private gain or corporate profit shall be exempt from the levy and collection of property tax if:
>
> (a) Such property is nonresidential . . . .

(Emphasis added.)

¶ 24    We thus consider the Hospital's contentions challenging both the BAA's conclusion regarding the Center's failure to satisfy section 39-3-110(1)(e) because its tuition is not charged "on the basis of ability to pay," and its conclusion that under section 39-3-108(1)(a), the Center is not used for strictly charitable purposes.

### III.    Standard of Review

¶ 25    The appropriate standard to be applied in reviewing the BAA's decision is set forth in section 24-4-106(7), C.R.S. 2017. *AM/FM Int'l*, 940 P.2d at 342. Under that section, we may set aside a decision of the BAA only if we determine that the BAA abused its discretion, "or that the order was arbitrary and capricious, based

16

upon findings of fact that were clearly erroneous, unsupported by substantial evidence, or otherwise contrary to law." *Boulder Cty. Bd. of Comm'rs v. HealthSouth Corp.*, 246 P.3d 948, 951 (Colo. 2011).

¶ 26     This case involves interpretation of an agency rule. The Division has interpreted the phrase in section 39-3-110(1)(e), "charges on the basis of ability to pay," by defining that phrase in its Rule IV.E.5. The Hospital does not argue that the Division's Rule IV.E.5 is itself improper. Instead, it argues that the BAA's interpretation of Rule IV.E.5 exceeded its authority. Because the BAA is essentially the appellate arm of the Division, we are, thus, concerned with an agency's interpretation of its own rule. Where an administrative body is interpreting its own rules and applying them to evidentiary facts, it is making an ultimate conclusion of fact. *Nixon v. City & Cty. of Denver*, 2014 COA 172, ¶ 23.

¶ 27     Conclusions of ultimate fact and an agency's interpretation and application of its own rules are entitled to deference; the agency's interpretation is to be accepted if it has a reasonable basis in the law. *Id.* Indeed, "an administrative agency's interpretation of its own regulations is generally entitled to great weight and should

17

not be disturbed on review unless plainly erroneous or inconsistent with such regulations." *Jiminez v. Indus. Claim Appeals Office*, 51 P.3d 1090, 1093 (Colo. App. 2002).

¶ 28    The determination of whether property is used for strictly charitable purposes must be made on a case-by-case basis to determine whether such use satisfies the statutory and constitutional requirements. *AM/FM Int'l*, 940 P.2d at 347. "[O]nly the judiciary may make a final decision as to whether or not any given property is used for charitable purposes within the meaning of the Colorado constitution." *Id.* at 343 (quoting § 39-3-101, C.R.S. 2017). In examining how the property is used, the property's charitable purpose as an end will be strictly construed. *E.g., W. Brandt Found., Inc. v. Carper*, 652 P.2d 564, 568 (Colo. 1982). The determination of whether an organization is a charity for the purposes of qualifying for a property tax exemption is a conclusion of ultimate fact, involving a mixed question of law and fact. *AM/FM Int'l*, 940 P.2d at 343.

IV.    Child Care Centers under Section 39-3-110

¶ 29    The BAA and the PTA denied the Hospital's application under section 39-3-110 by analyzing whether the Center met the

requirement of "charges on the basis of ability to pay" under subsection (1)(e). Thus, we now turn to an analysis of subsection (1)(e), and whether the BAA erred with respect to that statutory provision.

## A. Applicable Law

¶ 30 To qualify for a property tax exemption under section 39-3-110, a child care center must meet eight requirements. This appeal concerns only one of those requirements, subsection (1)(e), which mandates that the property is used as an integral part of a child care center

> [w]hich provides its services to an indefinite number of persons free of charge or at reduced rates equal to five percent of the gross revenues of such child care center or equal to ten percent of the amount of tuition charged by such child care center to the financially needy *or charges on the basis of ability to pay*[.]

§ 39-3-110(1)(e) (emphasis added). The Hospital concedes that it does not provide its services to an indefinite number of persons free of charge or at reduced rates equal to the percentages required in the first part of subsection (1)(e). Rather, the Hospital's central argument is that its policy of providing a 10% discount to all families with income below the federal poverty line and a 5%

19

discount for all siblings of enrolled children meets the requirement of subsection (1)(e) of charging "on the basis of ability to pay."

¶ 31     Rule IV.E.5 states that, for purposes of section 39-3-110(1)(e), the phrase "charges on the basis of ability to pay" means "that the total cost for each child is determined by a scale based on the recipient's financial status." The terms "scale" and "financial status" are not further defined in the Division rules. Moreover, there is no Colorado case law interpreting the language of subsection (1)(e) or Rule IV.E.5.

     B.     Testimony at the Hearing and the BAA Final Order

¶ 32     At the BAA hearing, Gueldenzopf testified that generally "based on the ability to pay tends to be some kind of scale which takes into account both the income of a particular family and the family size." He further testified that the 10% discount provided by the Center was not adequate because

> *[i]t only addresses one element, really.* So, for example, somebody who is $100 under that limit gets a 10 percent discount. Somebody whose income is a thousand dollars [under that limit] gets a 10 percent discount. Somebody whose income is $5,000 under that limit gets a 10 percent discount.

> We don't – we don't view that as really being reflective of the three different family's [sic] ability to pay. Certainly somebody who makes $5,000 less than the limit has a much tougher time paying the tuition for the child care center than somebody who is only $100 under the limit, but still everybody gets the same discount. *So to our mind, that was not really indicating or setting their fees based on the ability to pay.*

(Emphasis added.)

¶ 33 On cross-examination, counsel for the Hospital asked Gueldenzopf about an exhibit that described the Center's 10% federal poverty line discount. Gueldenzopf testified that "we wouldn't really consider this a scale. I mean, one line does not make a scale or one – being the poverty level line. Again, certainly people at various spots between these numbers would likely have different abilities to pay and that's not really reflected here."[3]

---

[3] On appeal, the Hospital focuses on the fact that the Division rules do not expressly define what a scale must include to determine a recipient's ability to pay. It further argues that, after Gueldenzopf's quoted testimony above regarding the exhibit, he admitted that the federal poverty line discount used by the Center was a "scale." We do not interpret his testimony to make such an admission. But, even if we agreed that Gueldenzopf testified that the federal poverty line discount was a "scale," that does not mean it was a scale based on ability to pay or the recipient's financial status.

¶ 34    Based on Gueldenzopf's testimony and the express language of

Rule IV.E.5, the BAA concluded that the definition of "charges on

the basis of ability to pay"

> requires the use of a graduated series of total
> cost for each child based on the financial
> status of the recipient. Under this definition,
> the total cost for each child would be greater
> for those with a stronger financial status. The
> total cost for each child would be less for those
> with a weaker financial status.

¶ 35    Using that definition and examples of families with different

income levels below the federal poverty line, the BAA agreed with

the PTA and found that "the Center's written tuition discount policy

clearly fails to meet the standard of charging on the basis of ability

to pay as defined by the rule." The BAA used the following

examples to illustrate its finding:

> Under the Center's tuition discount policy, a
> single parent with one infant child who has
> income of $23,000 per year (or $442 per week)
> would qualify for a 10% tuition discount equal
> to $31.90 per week and would pay $287.10 per
> week for child care at the Center. This
> amounts to 65% of the recipient's income.
>
> Another single parent with one infant child
> who has income of $15,000 per year (or $288
> per week) would qualify for the same 10%
> tuition discount equal to $31.90 per week and
> be required to pay the same $287.10 per week

for child care at the Center. However, this amounts to nearly 100% of the recipient's income.

The BAA went on to elaborate that

[t]he parent in the second scenario above, who has a much weaker financial status, pays the same amount per child as the parent in the first scenario above, who has a stronger financial status. The second parent has less ability to pay than the first parent, but the total cost for child care is the same for both parents. The Center's written tuition discount policy is not designed to charge on the basis of ability to pay.

### C. Analysis

¶ 36 The Hospital contends that the BAA exceeded its authority in interpreting Rule IV.E.5 regarding the definition of "charges on the basis of ability to pay." We disagree.

¶ 37 We look to the plain language of Rule IV.E.5 to determine if the BAA's interpretation of the definition applied in its order is plainly erroneous or lacks a reasonable basis in the law. *Nixon*, ¶ 23; *Jiminez*, 51 P.3d at 1093. We construe administrative rules using the same rules of construction we use for construing a statute. *Gessler v. Colo. Common Cause*, 2014 CO 44, ¶ 12 (citing *Regular Route Common Carrier Conference of Colo. Motor Carriers*

*Ass'n v. Pub. Util. Comm'n*, 761 P.2d 737, 745 (Colo. 1988)).

Because the Hospital concedes, and we agree, that the language of Rule IV.E.5 is unambiguous, we are limited to its plain language. *Id.* Also, because the Division rules do not define "scale," we are mindful that "where, as here, the [rule] does not define a term, the word at issue is a term of common usage, and people of ordinary intelligence need not guess at its meaning, we may refer to dictionary definitions in determining the plain and ordinary meaning." *Roalstad v. City of Lafayette*, 2015 COA 146, ¶ 34 (quoting *Mendoza v. Pioneer Gen. Ins. Co.*, 2014 COA 29, ¶ 24).

¶ 38     First, the Center's discount for tuition based on whether a family's income is above or below a single number, without taking into account anything more about the family's financial status, is simply not a payment based on the recipient's ability to pay, where the term "ability to pay" is defined by Rule IV.E.5 to mean "determined by a scale based on the recipient's financial status." Gueldenzopf illustrated this in his testimony with scenarios of parents with different income levels below the federal poverty line, and the BAA pointed this out with the scenarios quoted above. Instead, the discount provided by the Center is solely based on

24

whether a recipient's income is below the federal poverty line. If the General Assembly or the PTA intended to require that child care centers provide services at a cost based solely on that static factor, it could have said so. However, the statute reads "based on ability to pay," which, in our view and consistent with the language of Rule IV.E.5, requires a child care center to employ a more nuanced and less rigid approach to its tuition costs in order to qualify for an exemption under subsection (1)(e).

¶ 39   Second, we reject the Hospital's arguments that the Center's written discount policies qualify as a "scale" as required by Rule IV.E.5. Black's Law Dictionary defines a "scale" as "1. A *progression* of degrees; esp., a *range* of wage rates. 2. A wage according to a *range* of rates." Black's Law Dictionary 1545 (10th ed. 2014) (emphasis added). Thus, the plain and ordinary meaning of "scale" is a range or progression of options; it is not a single line that one falls above or below, such as the federal poverty line.

¶ 40   In contrast, a discount is "[a] reduction from the full amount or value of something, esp. a price." *Id.* at 564. More specific to the circumstances here, a discount is "a reduction from a price made to a specific customer or class of customers." Webster's Third

25

New International Dictionary of the English Language, Unabridged 646 (2002).

¶ 41 By these plain and ordinary meanings, the tuition reduction policy of the Center based solely on whether a family's income falls above or below the federal poverty line is a standard discount provided equally to all recipients of a certain class; it is not a scale that provides a range of tuition rates. The Center's use of a single number to draw a hard line for those families who can receive a set, static discount, and those families who must pay full tuition, is not a scale; it does not provide a range of tuition options, and it does not take into account more than one factor in determining a family's ability to pay.

¶ 42 The same analysis applies as well to the sibling discount. This tuition discount is provided to all parents with more than one child enrolled at the Center, regardless of income or any other factor indicating ability to pay. This tuition discount does not take into account a family's ability to pay in any way; rather, it appears to be a discount for loyalty to the Center.

¶ 43 We also reject the Hospital's argument that, essentially, the BAA exceeded its authority by interpreting "scale" to mean "sliding

26

scale." The Hospital argues that if the Division or the PTA meant to require a "sliding scale" it would have expressly said so, citing other agency regulations using that term. This argument fails for two reasons.

¶ 44 First and foremost, the term "sliding scale" does not appear in the record of the BAA hearing or in the BAA's order. Instead, the BAA refers to a scale that includes a "graduated series of total cost for each child . . . ." In fact, the only time the term "sliding scale" appears in the court file for this case is in the Hospital's amended notice of appeal and in its own briefs on appeal. Second, the rules and regulations cited by the Hospital are *from other agencies*. Whether, when, and how such other agencies may use the term "sliding scale" in their regulations is, in our view, not instructive in defining what a "scale" means in Rule IV.E.5 at issue here.

¶ 45 In sum, we cannot say that the BAA interpreted its own rule in a way that was plainly erroneous or inconsistent with the law when it concluded that, for purposes of subsection (1)(e), the required scale must include graduated (i.e., a progression of) tuition rates. We, therefore, affirm the BAA's order denying the Center's

application for property tax exemption based on section 39-3-110(1)(e).

## V. Strictly Charitable Purpose

¶ 46 The Hospital also contends that the BAA erred by finding that the Center is not operated for strictly charitable purposes. Again, we disagree.

¶ 47 The PTA denied the Hospital's application for property tax exemption for the Center, in part, because it did not satisfy the requirements of 39-3-108(1)(a), specifically finding that the Center did not provide a "gift." The BAA affirmed this decision, and it further found that the Center did not serve an indefinite number of people and did not lessen the burdens of government, citing the Colorado Constitution, section 39-3-108(1)(a), and several of the Division's rules.

¶ 48 Initially, we reject the BAA's argument on appeal that the Hospital has somehow abandoned the argument that the Center qualifies for property tax exemption under section 39-3-108(1)(a). The BAA argues that the Hospital abandoned this issue because it does not cite to that statute in its opening brief. However, an entire section of the Hospital's brief, *just like one section of the BAA order,*

28

is dedicated to the issue of whether the Center is a charity and is used for strictly charitable purposes. The BAA's order refers to this issue as a "Constitutional Analysis" and cites section 39-3-108(1)(a) in that section of its order. The Hospital appears to have followed that format and labeled its "strictly charitable purposes" argument as a constitutional analysis. Accordingly, we see no basis for concluding that the Hospital has abandoned this contention on appeal.

¶ 49    We also reject the PTA's argument on appeal that section 39-3-108 cannot apply to the Center because section 39-3-110 is the more specific statute that applies to child care centers. *See City of Colorado Springs v. Bd. of Cty. Comm'rs*, 895 P.2d 1105, 1118 (Colo. App. 1994) ("Statutes upon the same subject must be construed together and any conflicts reconciled if possible to give effect to the legislative purposes behind each section; particular statutes will prevail over general, and later provisions over former."). Here, the statutes are not in conflict; they merely cover different uses of property. On the one hand, a properly licensed child care center operating out of a private home may be able to qualify for exemption under section 39-3-110(1), but it would not be able to qualify under

29

39-3-108 because the property is residential.  On the other hand, a nonresidential child care center could qualify under 39-3-108(1)(a) because it operates as a charity with a strictly charitable purpose, but might not qualify under 39-3-110 because it does not meet one or more of the requirements under subsections (1)(a)-(h).  We will not interpret these statutes to be mutually exclusive without a clear expression of intent from the General Assembly to do so.  *See* Div. of Prop. Taxation Rule I.B.11, 8 Code Colo. Regs. 1304-2 ("The particular requirements for exemption under *each statute will be applied independently*.") (emphasis added).

## A.    Applicable Law

¶ 50    Colorado courts have consistently applied the following definition of a strictly charitable purpose:

> A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with the existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.

*AM/FM Int'l*, 940 P.2d at 344 (quoting *Jackson v. Phillips*, 96 Mass. (14 Allen) 539, 556 (1867)).

¶ 51    Thus, for a property to be used for strictly charitable purposes, it must provide a gift for the benefit of an indefinite number of persons. *Id.* The gift must lessen the burdens of government.[4] *Id.* It is the burden of the applicant to demonstrate that the use of the property relieves a governmental function and inures to the benefit of the public. *Id.* at 345.

¶ 52    In its rules, the Division has defined "charity" using the definition cited above and has further defined the terms "gift," "indefinite number of persons," and "lessening the burdens of government." Div. of Prop. Taxation Rules IV.A.1, IV.B.1, .2, .4, 8 Code Colo. Regs. 1304-2.

¶ 53    In determining whether an entity provides a gift, the Division's rule provides that such determination will be made "by analyzing

---

[4] There seems to be a debate in the case law regarding whether "lessening the burdens of government" is a separate pathway to proving a charitable purpose or if it modifies "all of the previously mentioned kinds of gifts" in the definition. *Bd. of Assessment Appeals v. AM/FM Int'l*, 940 P.2d 338, 344 (Colo. 1997). Because, as we conclude below, the Hospital has not established that the Center lessens the burdens of government, we need not decide this issue.

both the beneficent objects, goals or purposes of the entity and the organization's actual conduct." *Id.* Rule IV.B.1. The rule then lists numerous factors to be considered in evaluating the entity's objects, goals, and purposes. *Id.*

¶ 54    Another of the Division's rules provides that

> [w]hether an "indefinite number of persons" is served by an organization shall be determined by whether the beneficiaries of the organization's activities are involuntarily parts of the benefitted class. *When the right to benefit depends on a voluntary association with a particular society then that organization does not benefit an indefinite number of persons.*

*Id.* Rule IV.B.2 (emphasis added).

¶ 55    Lastly, the PTA determines whether an entity's work lessens the burdens of government by considering whether the entity's charitable work, if not being done by the entity, must be undertaken by the government at public expense. *Id.* Rule IV.B.4. This definition is also ensconced in Colorado case law: the activities undertaken by the entity must be "activities for which the government is responsible or which the government would be forced to assume in the absence of [the entity]'s activities" in order to

lessen the burdens of the government.  *AM/FM Int'l*, 940 P.2d at 346.

## B.    Analysis

¶ 56    Based on the testimony at the hearing and the exhibits admitted into evidence, the BAA determined that the Center was operating for a business purpose — namely, providing an employee benefit and recruitment tool — and not for a charitable purpose.  It also found that the Center did not benefit an indefinite number of persons and did not lessen the burdens of government.  We discern no error in the BAA's findings and conclusions.

¶ 57    First, contrary to the Hospital's arguments, the record shows that the Center in no way provides a "gift" within the meaning of the Division's rules.  As the BAA found, relying in part on the Hospital's own statements, the clear purpose in providing child care at the Center was to provide an employee benefit and recruitment tool for employees of the Hospital and CU Anschutz.  At the BAA hearing, the Hospital conceded that the Center serves "the faculty and students of the University of Colorado and the Anschutz campus.  The evidence will show that in order for the University to recruit and maintain exceptional faculty and students at [CU] Anschutz

. . . , it needs to provide a benefit, such as the [Center]." Counsel went on to state that the Center is specifically designed for parents who work in the medical field. And, in its opening brief on appeal, the Hospital again makes clear that "[t]he purpose of the Center is to provide child care to constituents of [the Hospital] and [CU Anschutz] *as an employee benefit* to attract and retain quality employees so that the hospitals can better serve their patients." (Emphasis added.)

¶ 58    These statements show that the overarching purpose and goal of the Center are to provide a benefit to employees of the Hospital and CU Anschutz, and for the Center to be used as a recruitment tool in its hiring process. As the BAA concluded, this demonstrates a pure business purpose.

¶ 59    Evidence of the actions of the Hospital and the Center further supports this conclusion. *See* Div. Prop. Taxation Rule IV.B.1, 8 Code Colo. Regs 1304-2 (in determining whether the entity bestows a "gift" we consider the organization's conduct as well as its stated goals and purpose). The record shows that the Center has dedicated the majority of enrollment spots to children of employees at the Hospital, CU Anschutz, and Fitzsimons. It has further

prioritized remaining slots for children of Bright Horizons, UPI, and UCH employees.

¶ 60    According to testimony at the hearing, at the beginning of an enrollment period, the number of spots available for children in the general community is limited to those spaces remaining after parents employed at the Hospital and CU Anschutz fill the contractually allotted slots.  Only if the number of enrolled children of the Hospital and CU Anschutz employees falls short of those allotments would additional spaces be available to other children. And, as reflected in the contract between the Hospital and the University, the Hospital and the University have priority for any unused allotted spaces: "[The Hospital] and the University have priority for unused child care spaces prior to spaces being transferred to the common pool and made available to either Bright Horizons' staff or the community."

¶ 61    Moreover, the witnesses for the Hospital testified that, as a result of the Center's prioritization policy, only 11 of the 248 children enrolled in 2014 were children of parents employed by Fitzsimons, UPI, and UCH, all of which are themselves associated with the Hospital or the University.  And, the record shows that this

prioritization policy resulted in an enrollment in 2014 of no children from the general community (i.e. children whose parents were not affiliated with the Hospital, CU Anschutz, Fitzsimons, Bright Horizons, UPI, or UCH).

¶ 62    The Center's allotment of spaces to the Hospital, CU Anschutz, and Fitzsimons and the written prioritization policy for children of the Hospital, CU Anschutz, Fitzsimons, and Bright Horizons staff are consistent with the Hospital's own acknowledgments that the Center is a recruitment tool and employment benefit, not a gift.

¶ 63    Second, the prioritization policy also shows that the child care services provided by the Center are not provided to an indefinite number of persons, because voluntary association with the Hospital, CU Anschutz, Bright Horizons, Fitzsimons, UPI, or UCH is effectively a de facto requirement for acquiring an enrollment spot at the Center.  We cannot say that the BAA abused its discretion in relying on the part of Rule IV.B.2 that excludes organizations with a voluntary association requirement and in concluding that "the Center is not provided for the benefit of an indefinite number of persons."

¶ 64    Third, the Hospital argues that the Center is used for strictly charitable purposes because it lessens the burden on the government by providing a child care center for a government entity, CU Anschutz, that would otherwise be providing such services at taxpayer expense. The Hospital asserts that, because child care is available at the University's Boulder and Colorado Springs campuses, the Center is providing a service that the state government would otherwise be required to provide on the CU Anschutz campus as well. This argument is not supported by the record.

¶ 65    Witnesses for the Hospital testified that the child care facilities on the Boulder and Colorado Springs campuses were "auxiliary services," meaning that they were open and operating based only on the tuition collected from parents; those centers' "ability to function . . . is dependent on the revenue [they] bring[] in." There was no evidence that the child care centers on those campuses received money from the state to operate. Moreover, when questioned by the BAA, witnesses could not say if the child care facilities on those campuses were owned and operated by the University or if they were owned and operated by a third party like Bright Horizons.

¶ 66    Thus, the evidence presented at the hearing shows that the funding of the child care centers on those campuses comes through revenue from tuition, not money from the University. There was simply no evidence presented at the hearing that the government would be paying for a child care center on the CU Anschutz campus absent the Center's existence.

¶ 67    What is more, no evidence was presented that showed the state government is *required* to provide child care on its state university campuses at the state's expense. *See AM/FM Int'l*, 940 P.2d at 346. The sine qua non of lessening the burdens of government is that the charitable work being done by the entity, if not being done by the entity, *must* be undertaken at public expense. Div. of Prop. Taxation Rule IV.B.4, 8 Code Colo. Regs. 1304-2. Similar to the entity in *AM/FM International*, nothing in the evidence adduced at the hearing in this case suggests that a child care center on a state university campus, such as the Center, is a "primary responsibility of government" or that the Center "directly performs any activities for which the government is responsible or

which the government would be forced to assume in the absence" of the Center's activities.[5] *AM/FM Int'l*, 940 P.2d at 346.

¶ 68 Therefore, we cannot conclude that the BAA abused its discretion in concluding that,

> [a]lthough having access to child care for [CU Anschutz] faculty, staff and students is a legitimate policy concern for the University from the perspective of employee retention, the Board was not convinced that providing a child care facility for the [CU Anschutz] faculty, staff and students is a primary responsibility of the University such that it would have to be carried on by the University at taxpayer expense . . . in the absence of [the Hospital] providing a child care center at the campus.

¶ 69 For the reasons discussed above, the Center does not provide its services as a gift to an indefinite number of persons and it does not lessen the burdens of government. Therefore, the BAA did not err in denying the Hospital's tax exemption application on the basis that the Center does not operate for strictly charitable purposes under section 39-3-108(1)(a).

---

[5] On appeal, the Hospital argues for the first time that the Center also lessens the burdens of government by providing early childhood education. We do not address arguments made for the first time on appeal. *E.g.*, *Minshall v. Johnston*, 2018 COA 44, ¶ 21. Moreover, nothing in the record shows that the State of Colorado is required to provide pre-school child care for all children in the state or for the faculty, staff, and students at the University.

## VI.  Conclusion

The BAA's order denying the Hospital's application for property tax exemption for the Center is affirmed.

JUDGE VOGT and JUDGE CASEBOLT concur.